PAPER CONVERTING MACHINE COMPANY, Plaintiff-Appellee,

v.

MAGNA–GRAPHICS CORPORATION, Defendant-Appellant.

Nos. 81–1487, 81–1766.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1982.

Decided April 26, 1982.

Jerome F. Fallon, Tilton, Fallon, Lungmus & Chestnut, Chicago, Ill., for plaintiff-appellee.

James R. Custin, Nilles & Custin, S.C., Milwaukee, Wis., for defendant-appellant.

Before SWYGERT, Senior Circuit Judge, POSNER, Circuit Judge, and BARTELS, District Judge.*

PER CURIAM.

This is an appeal from a judgment in favor of appellee, Paper Converting Machine Company, and against appellant, Magna-Graphics Corporation, entered in the District Court for the Eastern District of Wisconsin, holding valid appellee's patent covering a machine that rewinds toilet paper stock and paper towel stock from a

---

* The Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

5

parent roll onto small consumer rolls, and also finding the same infringed by appellant's machine; in the same order and judgment the court awarded treble damages and injunctive relief against the appellant.

After examination of the briefs and careful review of the record, and based upon the oral argument before this Court, we conclude that the district court in entering its order thoroughly and carefully analyzed all the issues raised in this appeal. Accordingly, we affirm the district court's order and judgment and hereby adopt its opinion entered on February 26, 1981, attached hereto as an appendix.

## APPENDIX

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This is an action for patent infringement arising under the patent laws of the United States, Title 35 U.S.C. The court has jurisdiction under 28 U.S.C. § 1338 and venue lies in this district under 28 U.S.C. § 1400(b).

A court trial was held in the action from November 3 through November 7, 1980. At issue is whether or not the defendant Magna-Graphics Corporation has infringed plaintiff Paper Converting Machine Company's United States Patent Reissue No. 28,-353 which is entitled "Web-Winding Apparatus and Method" and which was reissued on March 4, 1975, based upon original Patent No. 3,179,348 dated April 20, 1965. The parties have agreed that:

"8. Representative claims in suit are nos. 1, 4, 5 and 13. If any of said claims is held to be valid and infringed by the accused machine, plaintiff shall be entitled to an injunction restraining defendant from infringement of such claim and all other claims of the patent in suit that are generally similar to it; whereas if none of claims 1, 4, 5 and 13 is held valid and infringed, then plaintiff will not assert that any other claim of the patent in suit is infringed." (Statement of uncontroverted facts filed October 31, 1980.)

Upon review of the evidence presented at trial, the Court finds that claims 1, 4, 5 and 13 are valid and infringed.* The plaintiff

---

* Claims 1, 4, 5, and 13 are set forth in columns 12–15 of United States Patent Reissue No. 28,-353, and they are as follows:

"We claim:
"1. In web-winding apparatus equipped with a frame,
"(A) a roll rotatably supported on said frame, means for rotating said roll, means for feeding a web onto said roll for travel therewith while in partial wrapping engagement with said roll,
"(B) said frame also being equipped with a plurality of mandrels, means for moving said mandrels sequentially through a path in close proximity to the surface of said roll, the improvement comprising:
"(C) means for transversely severing said web to provide a free leading edge on said web for approaching a mandrel on which said web is to be wound in said path, [and]
"(D) *pin means extensibly mounted on said roll* for maintaining a web portion spaced from said edge in contact with said roll, *and pusher means extensibly mounted on said roll to urge said maintained web portion against an adjacent mandrel.*
            *    *    *    *    *    *
"4. In web-winding apparatus having a frame,
"(A) a roll rotatably supported on said frame,

"(1) means for rotating said roll,
"(2) means for feeding a web onto said roll for travel therewith while in partial wrapping engagement with said roll,
"(3) the roll having a longitudinally-extending slot in the surface thereof, said roll carrying a knife extendable out of said slot for cutting engagement with said web,
"(B) turret means rotatably supported on said frame,
"(1) a plurality of mandrel *mounted* on said turret means, means for rotating said turret means to move said mandrels sequentially through an orbital path,
"(2) said turret means being positioned on said frame relative to said roll to provide a segment of said orbital path in close proximity to the surface of said roll,
"(C) means on said frame for maintaining a severed web against said surface,
"(D) a pusher mounted in said roll for extension out of said slot to overcome said maintaining means, said pusher being mounted rearwardly of said knife in the direction of roll rotation, and means for sequentially extending said knife and pusher, said extending means being operative to extend said pusher at a time when said slot is aligned with said path segment.
"5. The apparatus of claim 4 in which said extending means comprises cam followers

is therefore also entitled, in addition to injunctive relief, to compensation for the infringement pursuant to 35 U.S.C. § 284.

With regard to the issue of the validity of claims 1, 4, 5 and 13 of the patent-in-suit, the subject matter of those claims was not obvious to a person with ordinary skill in the art at the time plaintiff applied for its patent. While each single element of the claims had precedent in the prior art, the combination of elements set forth in the patent-in-suit was novel, and it provided a workable solution to a recognized problem in the industry, that being the existing limitations on the speed of the rewinding process. Secondarily, the patent-in-suit provided a superior method for cutting and transferring two-ply web, but the primary benefit of the patent was speed.

The defendant designed the accused machine for use in winding single-ply hardwound rolls of toweling at high speeds. To achieve a hardwound roll for industrial use, the paper must be rewound under high tension. The defendant claims that the accused machine achieves higher tensions than the patented machine is capable of, that the primary purpose of the accused machine is to wind under high tension rather than at high speed, that the higher tension is made possible by the novel arrangement and design of the cutting and transfer mechanism in the accused machine, and, therefore, that the accused machine is non-infringing.

The Court finds, however, that there is no evidence that the accused machine achieves higher tensions than the patented mechanism is capable of, but on the contrary that the evidence supports findings that the patented machine, in addition to providing a superior method for rewinding double-ply paper, is capable of rewinding hardwound rolls under high tension at high speed, and also that with minor modification the defendant's machine could be adapted for creating a reverse fold instead of merely an "incipient curl" in the leading edge of the paper, which fold would enable the machine to rewind double-ply paper. Further, the evidence supports a finding that the arrangement and design of the cutting and transfer element in the accused machine was devised by the defendant for the purposes of avoiding the plaintiff's patent, and that in both function and design the mechanism is the substantial equivalent of the mechanism in the patented machine, and the Court is persuaded that in substance what the defendant did was to reverse the severing means, i.e., the knife and the pin means.

A patent claim is infringed if the accused device has a substantial identity of function, manner of operation, and results. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). With respect to claim 1 of the patent-in-suit, all of the elements described in the claim are present in the accused machine except that the pins are not "extensibly" mounted in the bedroll in the accused machine. The function of the pins in both machines is to impale the web for subsequent transfer to the new core. Defendant claims as an advantage of its retracted and immovable pins that the arrangement maintains the tension of the web against the bedroll and prevents the leading edge from being affected by wind. Since wind tension is not a problem in the patented machine, and since the patented machine is also capable of achieving high tension rewinding, the purported advantage is delusive, and, in fact, the apparatus in

for the extending of said knife, and pusher only during one predetermined roll revolution out of a plurality of revolutions constituting a winding cycle, said extending means further comprising means for positively locking said cam means during the remainder of said winding cycle.

\* \* \* \* \* \*

"13. In a method of rewinding webs, the steps of advancing a web in synchronism with a supporting roll, transversely severing said web to provide a folded free leading edge, and positioning a core-equipped mandrel in the path of the leading edge of said web, said web, rearwardly of said leading edge, being maintained against said supporting roll and thereafter urged outwardly from said roll against said mandrel."

the defendant's machine performs an equivalent function to the apparatus in the patented machine. Pursuant to 35 U.S.C. § 112, an element in a claim for a combination patent may be expressed "as a means or step for performing a specified function"—in this case, the impalement and transfer of the leading edge to the new core—"and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

As for claims 4 and 5, which are dependent claims, defendant's major point of distinction is in the mounting of the shaft to which the pusher is attached. The defendant argues that under the language of the claims, the shaft is a part of the pusher; that in the patented machine, the pusher is mounted rearward of the knife element in the bedroll; that in the accused machine the pusher is mounted forward of the knife element in the bedroll; that the structure of the machines is therefore different and defendant's is noninfringing; and that the advantage of the defendant's design for its purposes is to provide an increased forward motion of the web at the moment of transfer to maintain the tension of the web. First, however, the purported advantage is in fact not a real advantage since the forward impetus given to the web by the forward mounting of the shaft is de minimus. More importantly, a patent claim includes both the written language and the diagrammatic representations in the claim. Viewing together the writings; Figures 1, 2, 3, 4, 5, 7, 15, 16, 20, 21, 22, and 23 which are attached as Appendix A; and the representations in claims 4 and 5 of the patent-in-suit, a fair interpretation is that the pusher does not include the shaft upon which it is mounted. That being so, the pushers are mounted rearward of the knife element in the bedroll, and the defendant's arrangement is literally equivalent and is infringing.

Finally, with regard to claim 13 of the patent-in-suit, at issue is whether or not the accused machine makes a folded free leading edge. As previously stated, the Court finds that the "incipient curl" on the defendant's free leading edge can with minor modification to the accused machine be made into a folded free leading edge, and, therefore, it also finds that claim 13 of the patent-in-suit reads literally on the accused machine.

At the trial of this action, the Court examined with care the patent applications and diagrams submitted by the parties, and it also examined in detail the working models furnished by the parties of the cutting and transfer mechanism from the plaintiff's machine and from the accused machine. This decision is based upon the Court's examination of all of those items and upon all of the other evidence introduced and the testimony at trial.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the discussion above shall constitute a portion of the Court's findings of fact and conclusion of law. In addition, the Court makes the following specific findings of fact and conclusions of law which are adapted with minor modifications from those submitted by the plaintiff.

## FINDINGS OF FACT

### I. *Parties and Jurisdiction*

1. Plaintiff Paper Converting Machine Company is a corporation of the State of Wisconsin and has its principal place of business at Green Bay, Wisconsin.

2. Defendant Magna-Graphics Corporation is a corporation of the State of Wisconsin and has a regular and established place of business in this district at Van Buren Street Industrial Park, Oconto Falls, Wisconsin.

3. This is an action for patent infringement arising under the patent laws of the United States, Title 35 U.S.C., and this court has jurisdiction under 28 U.S.C. § 1338. Venue lies in this district by virtue of 28 U.S.C. § 1400(b).

4. Plaintiff is the sole owner of United States Patent Reissue No. 28,353 which is entitled "Web-Winding Apparatus And Method" and which was duly and legally

reissued on March 4, 1975, based upon original Patent No. 3,179,348 dated April 20, 1965, and plaintiff has the right to recover for any and all damages resulting from infringement of said Letters Patent within a six-year period preceding the filing of the complaint.

## II. *Background of Invention*

5. The invention relates to a web-winding apparatus and method and, more particularly, to that machine which paper converters refer to as an automatic rewinder. Apparatus of this character is employed when a wound web must be unwound and then rewound into smaller rolls. Illustrative of this operation insofar as paper is concerned is toilet tissue and paper toweling.

6. The apparatus serves to unwind the large diameter paper rolls provided by the paper machine and thereafter rewind the web onto cores for individual use. The parent roll may be several feet in diameter, and it is desired to unwind this roll continuously and at a relatively high rate of speed—of the order of 2,000 feet per minute. So the final retail size rolls of toilet paper and toweling take only a few seconds to wind.

7. Before the advent of the automatic rewinders, it was necessary to employ "stop-start" rewinders where the unwinding and rewinding operation was intermittent. The stopping was necessary in order for a new mandrel—the shaft for carrying the cardboard core—to be placed in the path of the web being unwound. The automatic rewinder solved this problem by automatically moving the new mandrel into the path of the web being unwound while the web was still being wound on another mandrel.

8. In prior art automatic rewinders, the cutoff occurs at a position between adjacent mandrels. The rewinder is equipped with six mandrels, each of which goes through the same orbital path. This achieves the following sequence: (1) the mandrel is equipped with a cardboard core on which the toilet paper or toweling is wound, (2) the core faced with glue, (3) the actual winding, and (4) the removal of the wound roll from the mandrel.

9. Near the end of rewinding on a given mandrel core, the subsequent mandrel is in a position close to the fast traveling web so as to pick it up and continue the rewinding operation when the web has been severed.

10. To achieve transfer of the web from the one mandrel to another, it was necessary to synchronize the cutting of the web with engagement of the web with the "new" mandrel—that mandrel just about to commence the web-winding operation. This became increasingly difficult to do as machine speeds exceeded 1,000 feet per minute. A certain amount of time was required for the knife to emerge, cut the web, have the associated pushers push the leading edge portion against the glue on the new cardboard core, and retract. This had to happen at a precise orientation of the bedroll so that it only could be done at relatively slow speeds. Trying to speed up the emergence retraction time of the knife resulted in a different problem. Since there was a certain amount of mass involved in the knife-pusher mechanism, moving it faster resulted in wear and premature failure.

## III. *The Invention*

11. The invention is set forth in claim 1 which consists of two parts: an introductory part which calls for the high speed rewinder, and an improvement characterizing part which specifies the mechanical elements providing the new operation and result.

12. The introductory part reads as follows:

"1. In web-winding apparatus equipped with a frame,

"(A) a roll rotatably supported on said frame, means for rotating said roll, means for feeding a web onto said roll for travel therewith while in partial wrapping engagement with said roll,

"(B) said frame also being equipped with a plurality of mandrels, means for

moving said mandrels sequentially through a path in close proximity to the surface of said roll * *." (Patent Reissue No. 28,353, Column 12, lines 23–31.)

This is best understood by viewing Figure 1 of the patent in suit (Appendix A–1) where the frame is designated 37, the roll (termed a "bedroll" in the specification) is numbered 36, and the means for rotating the roll is a motor 45 and associated gearing (not shown in Figure 1 in Appendix A–1). The means for feeding the web consists of the tension control mechanism 30, rolls 31, 32, pull rolls 33, and rolls 34, 35. The mandrels are designated 39 and are mounted on a turret 38 which constitutes the means for moving the mandrels.

13. The improvement characterizing part reads:

"(B) * * * the improvement comprising:
"(C) means for transversely severing said web for approaching a mandrel on which said web is to be wound in said path, [and]
"(D) *pin* means *extensibly mounted on said roll* for maintaining a web portion spaced from said edge in contact with said roll, *and pusher means extensibly mounted on said roll to urge said maintained web portion against an adjacent mandrel.*" (Patent Reissue No. 28,353, Column 12, lines 31–41.)

These elements can be best seen in Figure 21 (Appendix A–6). The transversely severing means includes a knife mechanism 51 which further includes knives 58 and 59 mounted on the bedroll 36 and a cooperating knife 64 provided on the cooperating chopper roll 49 (seen best in Figure 4 in Appendix A–4). The pin means which maintain a web portion in contact with the bedroll are designated 56, while the pusher means includes the pads 55, all cooperating to overcome the 1,000 feet per minute speed limitation.

14. The operation of the cutoff and transfer mechanism of the machine of the patent can be seen in sequence in Figures 20, 21, and 23 (Appendix A–6 and A–7).

Figure 20 represents the condition of the elements when normal winding is occurring—the web W traveling with the bedroll 36 and being wound on a retail size roll 50. Figure 21 shows the condition of the bedroll 36 and chopper roll 49 near the end of a winding cycle, while Figure 23 (also Figure 4 in Appendix A–4) shows the condition of these two elements at the beginning of a subsequent winding cycle. When the bedroll 36 is travelling at 2,000 feet per minute surface speed, the Figure 23 showing is about 0.03 seconds later than the showing in Figure 21. The web W in Figure 21 is seen in the process of being severed by a knife mechanism generally designated 51 so as to provide a leading edge 52 to engage the core 53 mounted on a mandrel 54 in the next winding station. In Figure 23 the edge 52 is seen in contact with the core 53 under the urging of a pad 55.

15. The result of this arrangement is that it is possible to utilize about 270° of one revolution of the bedroll 36 to operate the cutoff and transfer mechanism—it being seen in Figure 23 (Appendix A–7) that the extension of the knife mechanism 51 does not interfere with the winding of the web W on the "new" mandrel 54. In contrast to this, the prior art mechanisms had to achieve cutoff and transfer in a very small angular distance following the mandrel 54, i.e., the arc occupied by both the prior art knife and pusher. A secondary advantage of the invention is its ability to wind two-ply or multi-ply tissues as seen in Figure 5 (Appendix A–4). There the parts are in the same operative condition as seen in Figure 4 (Appendix A–4), but are seen operating against a web generally designated W and made up of webs W' and W". The web W" is seen to be trapped within the reverse fold 52a (Figures 22 and 23 in Appendix A–7) provided by the leading edge 52 as it is urged against the core 53 of the "new" mandrel 54.

IV. *History of the Patent*

16. The application for patent was filed September 17, 1962, by E. D. Nystrand, J. J. Bradley, and H. J. Spencer. Nystrand is

deceased but Bradley, his successor as vice president in charge of engineering for plaintiff, testified at the trial, and I was very impressed with his testimony. The examination of the application in the Patent Office resulted in the allowance immediately of 16 of the 21 claims presented, the remaining claims being modified thereafter and the patent issued as No. 3,179,348 on April 20, 1965, with twenty claims. On September 1, 1972, an application was filed to reissue the No. 3,179,348 patent because:

" * * * At the time of filing the application and during the prosecution thereof they [the inventors did not know of the existence of Christman Patent 2,585,226 which shows means for transversely severing said web to provide a free leading edge on said web for approaching a mandrel on which said web is to be wound in said path, and means for maintaining a web portion spaced from said edge in contact with said roll. The Christman patent was first brought to their attention on or about June 8, 1972 by the attorney who was handling the prosecution of the corresponding application in Germany, where the said Christman patent was cited as a reference. As a result of the study of the aforesaid Christman patent, it was determined that certain of the claims in the original patent were too broad, and, accordingly, an application for reissue with narrowed claims is sought.

"The above error arose through error and without any deceptive intention on their part." (From the "Oath" in the File Wrapper for Patent Reissue No. 28,353; see trial Exhibit No. 509.)

By the reissue claims 1 and 2 were modified, claim 3 was cancelled, and the patent issued as Patent Reissue No. 28,353 on March 4, 1975. Reissue Patent No. 28,353 has the same term as the original patent, expiring April 20, 1982.

## V. *Validity*

17. Although defendant has pleaded invalidity of the patent-in-suit on a number of grounds in its answer, it did not notify plaintiff of the particulars of the prior art on which it relies as required by 35 U.S.C. § 282. However, in view of the importance to the public of the validity of patents, the Court undertakes to determine whether the invention was obvious or not. To this end, the Court has (1) determined the scope and content of the prior art, (2) ascertained the difference between the prior art and the subject matter claimed, (3) determined the level of ordinary skill in the art, and (4) given consideration to the various secondary considerations listed in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

18. The scope and content of the prior art is reflected by the various patents considered by the Patent Office in granting the patent-in-suit. Because of the significance ascribed thereto by plaintiff (in applying for the reissue) and because it is mentioned in defendant's answers to certain interrogatories, the Court first considered the Christman Patent No. 2,585,226 (trial Exhibit No. 503).

Christman discloses (see Appendix B) a toilet paper rewinder and means in the form of knife 44 on the roll 43 and recess 37 on roll 25 for transversely severing a web ahead of a core 12 on a mandrel 16 about to be wound. The portion of the web rearward of the severed edge was intended to be held against the roll 25 by application of suction through the opening 38. Transfer of the web was intended by the release of suction. The patent also mentions that the roll 25 "may also be equipped with annular circumferential grooves, such as the groove 39, and with a stripper 40 (Patent No. 2,585,226, Column 2, lines 29–31), but these are only to prevent wrapups, not performing any pushing function. There was evidence that the Christman machine would not operate. The same was true of Kwitek Patent No. 2,237,759 (trial Exhibit No. 505) and Wood Patent No. 2,200,905 (trial Exhibit No. 506) which also had no means for pushing the web onto the core. The Kwitek Patent No. 2,512,900 (trial Exhibit No. 504A) shows the prior art type of cutoff and transfer subject to the speed limitation above described.

19. The difference between the subject matter claimed and the prior art resides in the provision of a free leading edge on the web which is necessarily folded and the employment of pusher means emerging from the bedroll to urge the leading edge portion of the web against the mandrel next to be wound. This applies not only to claim 1 but also to claims 4, 5, and 13 which are the claims elected by plaintiff as representative of the patent-in-suit.

20. The level of skill of the ordinary man skilled in the art of designing rewinders in 1961–1962 was that possessed by a person who had preferably a bachelor's degree in mechanical engineering and several years experience in the field of rewinder design. This can be considered an advanced technology area.

21. Of the secondary considerations, there was a long need for better cutoff and transfer, the version existing at the time of the invention in 1961 having been disclosed as early as 1941 and thought to be approved by the major producers. Further, the invention achieved widespread success. Over 500 machines embodying the invention have been sold. This is significant considering the limited number of producers of toilet paper and toweling. Finally, the defendant paid tribute to the invention when designing its own machine by considering adopting the prior art approach and then instead copying the invention.

22. The invention of the patent-in-suit was unobvious to one of ordinary skill in the art in 1961. Further, there is no suggestion in the prior art references, even in combination, of the structure, operation, and result of the claimed invention.

## VI. *The Accused Machine*

23. The accused machine was the subject of proposals to Scott Paper Company on January 13 and March 10, 1977, the order being given on September 22, 1977. Defendant had not built a rewinder before, although four of the five accused machine designers—Leanna, Jorgenson, Nehring, and Terp—were former employees of plaintiff.

24. The defendant's initial proposal of January 13, 1977, for the automatic cutoff and transfer read:

"As each winding roll reaches the predetermined count, the web is cut off and transferred to a new, empty core. Cutoff and transfer is effected by the Cutoff Knife and Transfer Brush Assembly, contained within the Main Bedroll. The Cut-off Knife and Transfer Brushes are withdrawn inside the Main Bedroll during normal running. When the desired count is reached, the Cut-off Knife comes out of the Bedroll at high speed, cutting the web. The Transfer Brushes, mounted behind the Knife brush the web on to the new core-shaft for the start of the next roll. Cut-off position is adjustable." (Trial Exhibit No. 35)

This was a literal description of the unacceptable prior art mechanism, so in the defendant's subsequent quotation of March 10, 1977, this was altered to read as follows:

"As each winding roll reaches the predetermined count, the vacuum held web is cut off and transferred to a new, empty core. Cut off and transfer is accomplished by a cut-off knife contained within a cut-off roll, and a web transfer assembly contained within a vacuum regulated main bedroll. The cut-off knife is withdrawn inside of the cut-off roll and the web transfer assembly is withdrawn inside of the vacuum regulated main bedroll during normal running. Just prior to when the desired count is reached, the vacuum is applied thus holding the trailing portion of the web to the bedroll and the cut-off knife then is actuated out of cut-off roll and inserted into a groove in the vacuum regulated main bedroll thus severing the web. The leading edge continues to be wound on the finished roll. The trailing web edge (held by vacuum) is brought around to transfer location where the web transfer assembly located inside the main bedroll protrudes outward, thus transferring the vacuum-held web to the new core shaft for start of next roll. The cut-off knife and web transfer assembly is then cam returned to

their original position. Vacuum on-off positions are adjustable." (Trial Exhibit No. 36)

This followed the disclosure of the Christman patent which also utilized vacuum or suction. This idea was also dropped, the defendant turning instead to the patented construction.

25. The defendant's machine for Scott-Oconto Falls was delivered with a mechanical transfer system utilizing pads that came out of the bedroll to press the sheet onto the core. The movable element for cutting and impaling was placed in the cooperating cutoff roll, however, rather than in the bedroll which is where it is located in the patented machine.

26. In the patented machine, a pivot shaft 62 carries both the pins 56 and a knife mechanism 51 consisting of two spaced apart blades to suspend the web for puncture by a knife 64 on the cooperating chopper roll 49. The pins 56 impale the web by acting against an element 67 on the chopper roll. So the one pivoting movement of the shaft 62 sequentially severs and impales the web. (See Figure 4 in Appendix A–4.)

27. In the accused machine, a pivot shaft 42 on the cooperating cutoff roll carries a knife 33 and a web impalement pusher bar 36. (See Appendix C–1) The knife 33 punctures the web suspended over the slot 31—just as in the patented machine, the only difference being that in the plaintiff's machine, the suspended web does not move out to meet a knife in the cooperating roll, and in the accused machine the knife on the cooperating roll moves in to effect rupture. The same reversal applies to impalement. In the patented machine, the pivot shaft moves the pins out to engage an element on the cooperating roll. In the defendant's version, the pivot shaft moves the impalement pusher bar 36 in to impale the web on the pins 32.

28. According to Scott's finishing engineer, Raymond Tabar, who was knowledgeable about both machines, it made no difference whether the knife was mounted in one roll or the other. He also testified that it made no difference whether the pins came out to impale the web or the web was pushed onto the pins.

29. In its responses to requests for admission of fact, defendant admitted that all of the mechanical elements of the claim were present in its machine except that the pin means was not "extensibly" mounted.

30. The description of the entire element reads:

"(D) *pin* means *extensibly mounted on said roll* for maintaining a web portion spaced from said edge in contact with said roll * * *." (Patent Reissue No. 28,353, Column 12, lines 36–39.)

So where the pin means is mounted is not important per se but only to achieve the objective of the recited clause, viz., for "maintaining a web portion." The Court finds that this is achieved in a substantially equivalent manner in defendant's machine as in the machine of the patent-in-suit.

31. The Court also finds that according to the United States patent laws, an element expressed as a means is to be construed to cover equivalents. See 35 U.S.C. § 112 which provides in pertinent part as follows:

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and *equivalents* thereof." (Emphasis supplied.)

Inasmuch as the Court has found the defendant's pin means to be the full mechanical equivalent of that of the patent, all of the elements of claim 1 are present in the defendant's machine, and the claim is infringed.

32. Claim 4 of the patent calls for the following mechanical elements:

(a) a frame,

(b) a roll rotatably supported on said frame,

(c) means for rotating said roll,

(d) means for feeding a web onto said roll for travel therewith while in partial wrapping engagement with said roll,

(e) the roll having a longitudinally extending slot in the surface thereof,

(f) said roll carrying a knife extendable out of said slot for cutting engagement with said web,

(g) turret means rotatably supported on said frame,

(h) a plurality of mandrels mounted on said turret means,

(i) means for rotating said turret means to move said mandrels sequentially through an orbital path,

(j) said turret means being positioned on said frame relative to said roll to provide a segment of said orbital path in close proximity to the surface of said roll,

(k) means on said frame for maintaining a severed web against said surface,

(l) a pusher mounted in said roll for extension out of said slot to overcome said maintaining means, said pusher being mounted rearwardly of said knife in the direction of roll rotation, and

(m) means for extending said pusher, said extending means being operative to extend said pusher at a time when said slot is aligned with said path segment;

and defendant has admitted the presence in the accused machine of all elements except those designated (f) and (l). The issue is whether these elements or their equivalents are present.

33. Item (f) specifies that the bedroll has a knife in a slot. The presence of the slot has been admitted, this being the element designed 31 in defendant's drawings. Provided within that slot, or at least at the edge of the groove in the defendant's bedroll, is an element 34 which is called a "cutting bar." The bar 34 helps suspend the web for engagement by a cooperating element 33 on the cutoff roll, the element 33 being called the knife. (See Appendix C–1.) In the patent the knife mechanism 51 is ineffective to cut the web without the cooperation of the knife 64 on the chopper roll 49. (See Figure 4 in Appendix A–4.) Likewise, defendant's cutoff roll knife 33 would be ineffective without the cutting bar 34. In both cases a pair of elements are required for cutting, one in the bedroll and one in the cooperating roll. Which element is termed the "knife" is unimportant. The Court finds that the bedroll of defendant's machine does indeed have a knife in its slot.

34. As to item (l), this requires that the pusher be "mounted rearwardly of said knife in the direction of roll rotation." (Patent Reissue No. 28,353, Column 13, lines 22–23.) What this reflects is that the pad 55 trails behind the knife mechanism 51 as clearly illustrated in Figure 21 (see Appendix A–6) of the patent-in-suit. This is for the purpose of enabling the pusher to sweep through the pins 56 and press the web leading edge portion against the mandrel to be wound. This is the precise location and function of defendant's pads 38 (see Appendix C–1) so there is literal readability as well as identity of means, operation, and result. Defendant contends that the claim is avoided because the actual mounting, i.e., the pivot shaft 40 which carries the pusher pads, is forward of the knife, whereas the pivot shaft 72 in the patent-in-suit is rearward of the knife. This elevates form over substance inasmuch as the location of the pivot shaft is irrelevant, the claim referring to the location of the pusher to serve its intended function. Furthermore, reading the written language of the claim in conjunction with viewing the diagrams, a fair conclusion is that the pusher does not include the shaft on which it is mounted. Because there is literal readability as well as identity of means, function, and result, the Court finds claim 4 to be infringed.

35. Claim 5 of the patent is dependent on claim 4 and specifies in addition that the

"* * * extending means comprises cam followers for the extending of said knife, and pusher only during one predetermined roll revolution out of a plurality of revolutions constituting a winding cycle, said extending means further comprising means for positively locking said cam means during the remainder of said winding cycle." (Patent Reissue No. 28,353, Column 13, lines 27–33.)

The extending means referred to is the means "for sequentially extending said knife and pusher" so the corresponding mechanisms for these two elements will be considered separately.

36. According to the patent-in-suit, a cycle of cutoff and transfer is initiated by a counting mechanism energizing the solenoid 116 to shift the solenoid armature 117. This also shifts the cam follower 121 (see Figure 3 in Appendix A–3) into alignment with the trip cam 89 associated with the knife mechanism 51. The engagement of the follower 121 with the cam 89 pivot shaft 81 (as can be seen from a comparison of Figures 15 and 16 in Appendix A–5) so that the cam follower 91 can ride on the inner surface 92a of cam 92 (Figure 2 in Appendix A–2). The pivoting of shaft 81 disengages the trip latch 80, and the spring arm 74 is rotated under the urging of spring 77 to place cam follower 93 in contact with the exterior surface 92b of cam 92. The motion of the cam follower 93 causes the pivot shaft 62 to pivot to the knife actuating position where the knife mechanism 51 is extended. The knife continues to be in a condition to cut until it is locked out of the cutting mode by cam action. This is performed by the cam portion 92e which is engaged by the cam follower 91, serving to pivot the shaft 81 and relatch the trip latch 80, thereby locking the pivot shaft 62 and hence the knife mechanism 51 out of the cutting mode for the remainder of the winding cycle.

37. The counterpart timing mechanism in the accused machine for extending the knife 33 is located in the cutoff roll. This the Court finds to be a full equivalent, particularly in view of the fact that the claim calls for "extending means." See 35 U.S.C. § 112. Again, the cycle is initiated by the energization of a solenoid, as at 51. This moves movable cam 50 to a position where a cam follower 47 on actuating arm 46 engages the cam 50 to rotate the rock shaft 42 to extend the knife 33. In doing this the rock shaft 42 moves a detent cam arm 53 to move a bell crank 55 against the urging of spring 57. The knife continues to be in a condition to cut until it is locked out of the cutting mode by cam action. This is performed by the fixed cam 49 which is engaged by the cam follower 47 serving to pivot the rock shaft 42 and hence the detent cam arm 53 to lock the position, thereby locking the pivot shaft 42 and hence the knife 33 out of the cutting mode for the remainder of the winding cycle. (See Figure 11 in Appendix C–2.)

38. From this description, the Court finds that both the machine of the patent and the defendant's machine have cam followers as at 121, 91, 47, respectively. (See Figure 1 on Appendix A–1 and Appendix C–3.) These followers perform identical functions in extending the knife only during one predetermined revolution out of a plurality of revolutions constituting a winding cycle. As to the means for positively locking the "cam means [sic] during the remainder of said winding cycle" (Patent Reissue No. 28,353, Column 13, lines 32–33) —the cam means referring to the cam followers—in the patent, the trip latch 80 is operative to lock the shaft 62 (see Figure 15 in Appendix A–5), while in the defendant's machine the detent cam arm 53 provides the same locking function (see Figure 11 in Appendix C–2).

39. As far as the pusher is concerned, in the patented machine a counterpart set of trip latch 95 and cam follower 111 (see Figure 2 in Appendix A–2 and Figure 15 in Appendix A–5) operate in the fashion just described relative to the knife to extend and lock the same. In the defendant's machine a second solenoid 84 is employed to initiate pusher action (see Figure 11 in Appendix C–2) as compared with a single solenoid 116 for actuating both the knife and pushers in the patent (see Figure 3 in Appendix A–3). Duplication of elements with no change in function does not avoid infringement. The energization of solenoid 84 permits movement of control lever 74 to place cam follower 82 against cam 83 (see Figure 11 in Appendix C–2). This controls

the degree of emergence of the pusher 38. The pushers continue to be in the extended condition until they are locked out of this mode by cam action. This is performed by the cam 83 which is engaged by the follower 82 serving to pivot the pivot shaft 40 and control lever 74 and hence latching arm 79 to locked position. (See Figure 12 in Appendix C–2 and Appendix C–3.) This permits extension of the latch bolt 73, thereby locking the pivot shaft 40 and hence the pushers 38 out of the transfer mode for the remainder of the winding cycle. (See Appendix C–3.) Although certain of the members in the plaintiff's machine are of somewhat different form, they perform the same operation to achieve the same result. Claim 5 is therefore infringed.

40. Claim 13 of the patent calls for performing the following steps:

(a) advancing a web in synchronism with a supporting roll,

(b) transversely severing said web to provide a folded free leading edge,

(c) positioning a core-equipped mandrel in the path of the leading edge of said web, and

(d) said web, rearwardly of said leading edge being maintained against said supporting roll and thereafter urged outwardly from said roll against mandrel.

Defendant admits the presence of all but step (b).

41. The justification urged by defendant in support of its denial of step (b) is that it does not provide a "folded free leading edge" of the character specified in the patent. Based on the Tabar testimony, the Court finds that there is an incipient fold of the character contemplated by the patent, and that with minor modification the accused machine can be made to produce a leading edge of exactly the character specified in the patent. Inasmuch as imperfect practice of the patent or failure to utilize all the advantages thereof does not avoid infringement, claim 13 is infringed by the operation of defendant's machine.

42. Plaintiff has placed the required statutory notice on all machines manufactured and sold by it under the patent, and has given written notice to defendant of defendant's alleged infringement.

43. Defendant made and sold the accused machine with full knowledge of plaintiff's patent and without having obtained an opinion of counsel relative to infringement as to changes made only to avoid the patent with no corresponding change in function. Defendant is therefore an intentional infringer subject to the award of increased damages under 35 U.S.C. § 284.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter, and venue is proper.

2. Title 35 U.S.C. § 282 provides: "A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." This burden is a heavy one, and proof of patent invalidity must be established by clear and convincing evidence. *Malsbary Manufacturing Company v. Ald, Incorporated*, 447 F.2d 809, 812 (7th Cir. 1971); *Ortman v. Maass*, 391 F.2d 677, 681 (7th Cir. 1968); *Walt Disney Productions v. Fred A. Niles Communications Center, Inc.*, 369 F.2d 230, 234 (7th Cir. 1966).

3. There is strong public interest in establishing the validity or invalidity of a patent. *Lear, Inc. v. Adkins*, 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969).

Where the prior art relied upon for purposes of establishing patent invalidity was actually considered by the Patent Office, the presumption of validity is strengthened. *Ortho Pharmaceutical Corporation v. American Hospital Supply Corporation*, 534 F.2d 89, 93–94 (7th Cir. 1976); *Tracor, Inc. v. Hewlett-Packard Company*, 519 F.2d 1288, 1306 (7th Cir. 1975); *Ellipse Corpora-*

tion v. Ford Motor Company, 452 F.2d 163, 170 (7th Cir. 1971), cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); LaSalle Street Press, Inc. v. McCormick and Henderson, Inc., 445 F.2d 84, 93 (7th Cir. 1971); TSC Industries, Inc. v. International Harvester Company, 406 F.2d 53, 57 (7th Cir. 1968); Lewyt Corporation v. Health-Mor, Inc., 181 F.2d 855, 857 (7th Cir. 1950).

5. With respect to the question of obviousness under 35 U.S.C. § 103, the scope and content of the prior art and the differences between the prior art and the claims at issue are to be determined. The level of ordinary skill in the pertinent art must also be resolved. Against this background the question of obviousness or nonobviousness of the claimed subject matter is decided. Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). The usual way of determining "the level of ordinary skill" in a particular art is by referring to the subjective reaction of a person thoroughly familiar with the particular art and, if possible, one who practiced the art at the crucial time in question. Malsbary Manufacturing Company v. Ald, Inc., 447 F.2d 809, 811 (7th Cir. 1971).

6. Secondary tests are also applicable to give light to the circumstances surrounding the patented subject matter and have relevancy to the determination of obviousness or nonobviousness of such subject matter. Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966). These tests include:

(a) Did the patented invention fulfill a long-felt need in the industry to which it applied? Ortho Pharmaceutical Corporation v. American Hospital Supply Corporation, supra, 534 F.2d at 93; Rex Chainbelt, Inc. v. General Kinematics Corporation, 363 F.2d 336, 337 (7th Cir. 1966).

(b) Did the patented invention meet with substantial success upon its introduction to the market? Ortho Pharmaceutical Corporation v. American Hospital

Supply Corporation, supra, 534 F.2d at 93; Continental Can Company, Inc. v. Anchor Hocking Glass Corporation, 362 F.2d 123, 124 (7th Cir. 1966).

(c) Did the accused infringer recognize that the invention was truly meritorious? AMP Incorporated v. Molex Products Company, 329 F.Supp. 1364, 1371 (N.D.Ill. 1971).

The imitation of the patented invention by defendant is conclusive evidence of what it thinks of the patent in suit and is persuasive of what the rest of the world ought to think. Anderson Company v. Sears, Roebuck & Co., 165 F.Supp. 611, 623 (N.D.Ill. 1958), modified, 265 F.2d 755 (7th Cir. 1959). See also Copease Manufacturing Company v. American Photocopy Equipment Co., 298 F.2d 772, 781 (7th Cir. 1961); Ric–Wil Co. v. E. B. Kaiser Co., 179 F.2d 401, 404 (7th Cir. 1950), cert. denied, 339 U.S. 958, 70 S.Ct. 981, 94 L.Ed. 1369 (1950); Charles Peckat Mfg. Co. v. Jacobs, 178 F.2d 794, 801 (7th Cir. 1949).

7. The patent in suit, Patent Reissue No. 28,353, is good and valid in law, and the asserted claims thereof, namely, claims 1, 4, 5, and 13 of the patent, are valid and enforceable.

8. To establish infringement of a product patent, the patent owner must demonstrate that the alleged infringer has made, used, or sold the product coming within the scope of the claimed inventions. Reese v. Elkhart Welding & Boiler Works, Inc., 447 F.2d 517, 527 (7th Cir. 1971), and University of Illinois Foundation v. Block Drug Co., 133 F.Supp. 580, 584 (E.D.Ill. 1955), aff'd, 241 F.2d 6 (7th Cir. 1957), cert. denied, 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957).

9. The test of infringement is whether the device claimed in the patent and the alleged infringing device perform substantially the same function in substantially the same way and accomplish substantially the same result. Graver Tank &

*Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Ortman v. Maass,* 391 F.2d 677, 682 (7th Cir. 1968).

10. An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. 35 U.S.C. § 112.

11. An infringement is not avoided by a mere reversal or transposition of parts, or a mere change in form without change in function. *Hunt v. Armour & Co.,* 185 F.2d 722, 728 (7th Cir. 1950).

12. That the accused machine operates less efficiently or fails to realize all the advantages of the invention does not avoid infringement. *Panther Pumps & Equipment Company, Inc. v. Hydrocraft, Inc.,* 566 F.2d 8, 20 (7th Cir. 1977); *Admiral Corporation v. Zenith Radio Corporation,* 296 F.2d 708, 717 (10th Cir. 1961).

13. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

14. Patent Reissue No. 28,353 is good and valid in the law, and claims 1, 4, 5, and 13 thereof have been infringed by the defendant by the making and selling of a rewinder to Scott Paper Company at Oconto Falls, Wisconsin.

### ORDER

It is Ordered that the defendant Magna-Graphics Corporation, its officers, employees, and agents and those in privity with them are enjoined from infringing United States Patent Reissue No. 28,353 by the manufacture of and/or sale of rewinders embodying the claimed cutoff and transfer pursuant to 35 U.S.C. § 283; and that the defendant is liable to the plaintiff Paper Converting Machine Company as a result of its past infringement for damages which shall be increased threefold for willful and deliberate infringement pursuant to 35 U.S.C. § 284.

It Is Further Ordered that judgment is to be entered for the plaintiff Paper Converting Machine Company in accordance with the foregoing findings of fact and conclusions of law.

Dated at Milwaukee, Wisconsin, this 26th day of February, 1981.

UNITED STATES DISTRICT COURT
By: JOHN W. REYNOLDS
Chief Judge

### ORDER

On February 26, 1981, the Court entered findings of fact, conclusions of law, and order ("order") in this action, enjoining the defendant from infringing the plaintiff's United States Patent Reissue No. 28,353 and finding that the defendant is liable to the plaintiff for triple the amount of the plaintiff's damages resulting from past infringement. Judgment was entered the same day.

Now pending before the court is the defendant's motion, brought pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, to amend the February 26, 1981, order by deleting that portion providing for an award of treble damages and deleting the second sentence of Finding of Fact No. 43 which reads: "Defendant is therefore an intentional infringer subject to the award of increased damages under 35 U.S.C. § 284." For the following reasons, the defendant's motion will be denied.

First, the defendant states that since the trial of this action, the United States Patent and Trademark Office has

allowed the patent application covering the accused machine. The allowance of a patent application does not, however, preclude a finding of infringement. *Sanitary Refrigerator Company v. Winters,* 280 U.S. 30, 43, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929); *Paper Converting Machine Co. v. F M C Corporation,* 409 F.2d 344, 353 (7th Cir. 1969) (in which damages ultimately were increased by 50% for willful infringement, see 432 F.Supp. 907). In this case the Court, based upon the testimony of the experts at trial, was persuaded that the plaintiff's machine is capable of rewinding hardwound rolls under high tension. The defendant's patent application was allowed based in part upon the defendant's assertion that plaintiff's machine lacks the capability just described. Thus the allowance of the patent application, issued as it was without the benefit of the evidence presented to the court, is not persuasive of whether or not the defendant had a good faith basis upon which to claim that its machine was noninfringing.

Second, defendant argues that a finding of entitlement to treble damages under 35 U.S.C. § 284 should be made only after an accounting has been concluded. See *Pyle Nat. Co. v. Lewin,* 92 F.2d 628, 631–632 (7th Cir. 1937), holding that under former Title 35, § 70, which is one of the predecessor statutes to present § 284, the Court should proceed in an orderly fashion to consider injunctive relief, then to direct an accounting, and then to consider an increase in the damages awarded. Although present § 284 provides for the same types of relief, the language of the statute is substantially different. Since the repeal of former Title 35, in several cases the Seventh Circuit has considered whether a defendant's conduct merited a district court's treble damage award which was made before any accounting without suggesting that the timing of the finding on treble damages was inappropriate. See, e.g., *Aerosol Research Company v. Scovill Manufacturing Company (A. Schrader's Son Divi-*

*sion),* 334 F.2d 751 (7th Cir. 1964); *Rex Chainbelt, Inc. v. General Kinematics Corporation,* 363 F.2d 336 (7th Cir. 1966). It thus appears that it was proper for this Court to make a finding on the appropriateness of a treble damage award before the amount of the actual damages was ascertained.

Finally, in the February 26, 1981, order the Court found at pages 2 to 3 and in Finding of Fact No. 43 that the reversal of the severing means in the accused machine was done solely for the purpose of avoiding the plaintiff's patent, that it does not reflect a change in either function or design, and that it was done with full knowledge of the plaintiff's patent. The Court noted further that four of the five designers of the accused machine were former employees of the plaintiff (Finding of Fact No. 23), and that the defendant did not seek advice of counsel before manufacturing the accused machine (Finding of Fact No. 43). Finding of Fact No. 43 is inartfully written since it could be read as stating a per se rule that one who fails to seek the advice of counsel and is later found to be an infringer will be liable for treble damages. Such was not the Court's intent. Rather, the Court relied upon all of the facts set forth in this paragraph in reaching its conclusion that the defendant's infringement was deliberate and merited an award of treble damages. The finding makes specific reference to the fact that the changes in the accused machine were made for no other purpose than to avoid the plaintiff's patent. The finding will be allowed to stand as written.

For the foregoing reasons,

It Is Ordered that the defendant's motion for modification of the February 26, 1981, order entered in this action is denied.

Dated at Milwaukee, Wisconsin, this 20th day of April, 1981.

UNITED STATES DISTRICT COURT

By: JOHN W. REYNOLDS

Chief Judge

*Fig. 1.*

NYSTRAND ET AL
RE. 28,353

March 4, 1975     E. D. NYSTRAND ET AL     Re. 28,353

WEB-WINDING APPARATUS AND METHOD

Original Filed Sept. 17, 1962                     8 Sheets-Sheet 2

*FIG. 19.*

*FIG. 2.*

March 4, 1975    E. O. NYSTRAND ET AL    Re. 28,353

WEB-WINDING APPARATUS AND METHOD

Original Filed Sept. 17, 1962    8 Sheets-Sheet 3

FIG.3.

FIG.12.

March 4, 1975    E. D. NYSTRAND ET AL    Re. 28,353

WEB-WINDING APPARATUS AND METHOD

Original Filed Sept. 17, 1962    8 Sheets-Sheet 4

March 4, 1975    E. D. NYSTRAND ET AL    Re. 28,353

WEB-WINDING APPARATUS AND METHOD

Original Filed Sept. 17, 1962                8 Sheets-Sheet 6

FIG.15.

FIG.16.

FIG.17.

FIG.18.

March 4, 1975     E. D. NYSTRAND ET AL     Re. 28,353

WEB-WINDING APPARATUS AND METHOD

Original Filed Sept. 17, 1962                    8 Sheets—Sheet 7

FIG. 20.

FIG. 21.

March 4, 1975          E. D. NYSTRAND ET AL          Re. 28,353

WEB-WINDING APPARATUS AND METHOD

Original Filed Sept. 17, 1962                    8 Sheets-Sheet 8

FIG. 22.

FIG. 23.

Feb. 12, 1952                P. J. CHRISTMAN                2,585,226

WINDING APPARATUS

Filed March 21, 1946                                    4 Sheets-Sheet 1

*Fig.1*

*Fig.2*

*Fig.3*

Inventor:
Peter J. Christman,
By
Attorneys.

UNITED STATES DISTRICT COURT
EASTERN DIST. OF WISCONSIN
Case No.
Exh. No.
Date Rec'd
Deputy Clerk

FIG. 5

UNITED STATES DISTRICT COURT
EASTERN DIST. OF WISCONSIN
Case No. 79-C-499
Exh. No. 27A
Date Rec'd 11/2/82
Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DIST. OF WISCONSIN
Case No. 79-C-499
Exh. No. 27E
Date Rec'd
Deputy Clerk