**REX CHAINBELT, INC., Plaintiff-Appellee,**

v.

**GENERAL KINEMATICS CORPORA-TION, and Albert Musschoot, Defendants-Appellants.**

**No. 15213.**

United States Court of Appeals Seventh Circuit.

June 30, 1966.

William J. Stellman, James C. Wood, Hofgren, Wegner, Allen, Stellman & McCord, Chicago, Ill., for defendants-appellants.

Albert H. Pendleton, Ralph E. Church, Jr., Chicago, Ill., for plaintiff-appellee.

Before DUFFY, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

The United States District Court entered a decree finding the Musschoot Patent, No. 2,984,339, valid and in-

fringed by the defendants-appellants, General Kinematics Corporation and Albert Musschoot. This appeal followed.

The plaintiff Rex Chainbelt, Inc., acquired the patent in suit when it purchased the assets of Carrier Conveyor Corporation, by whom Albert Musschoot had been employed.

The District Court found that Mr. Musschoot assumed duties with Carrier under a two-year contract which called for an annual salary of $18,000 with an option to purchase company stock, which he exercised. His salary was later raised to $20,000, and he became a vice-president of the company.

At the outset of his employment, Mr. Musschoot was put in charge of development, engineering and sales of Carrier's "new products division." His first assignment was to make a variable rate or controlled stroke vibratory feeder.

On May 16, 1961, the patent in suit entitled "Tunable Vibratory Apparatus" was issued on an application, filed July 6, 1959, in the name of Mr. Musschoot as inventor, which was assigned to Carrier pursuant to Mr. Musschoot's agreement to assign inventions made during his employment. The application was subsequently assigned on December 21, 1959, to Chain Belt Company, which later changed its name to Rex Chainbelt Company, the plaintiff herein.

After about two years, Mr. Musschoot left plaintiff's employment and started a new business, General Kinematics Corporation, of which he is president and majority stockholder. The District Court found that the corporate defendant is Mr. Musschoot's alter ego, that he induced infringement of the plaintiff's patent by the corporate defendant, participating in its manufacture and sale of the accused devices; that both were guilty of conscious, deliberate and willful infringement. The District Court awarded the plaintiff treble damages (Title 35 U.S.C. § 284) and attorneys' fees. (Title 35 U.S.C. § 285)

The defendants asserted that the essential elements of the accused feeder were shown in the prior art; that the claims of the patent in suit were not infringed. They also asked the District Court to hold the patent in suit invalid on its own motion.

The defendants do not challenge the District Court's findings of fact that when Mr. Musschoot was employed, Carrier had a vibratory feeder with AC–DC converter and DC motor, capable of regulation by varying the speed of its drive; that it had several steel coil springs, some of which Mr. Musschoot replaced with Firestone Airride springs or air bags, which Carrier had in stock, thus demonstrating the possibility of making a variable rate feeder by varying the spring system. The cooperation of air bags with coil springs made it possible to adjust the natural frequency of the device through a wide range not previously available, changing the speed of conveyance of bulky material at will by a small simple adjustment of an air valve.

The District Court found that a feeder which could be adjusted only by varying the speed of its drive was limited in use, in acceptance by the trade and in economic competition. Early in 1958 the market for variable rate feeders far exceeded that for fixed rate feeders.

It is not disputed that the invention of the patent in suit was reduced to practice no later than July 17, 1958. On the same day the directors of Carrier authorized a special bonus of $2000 which was paid to Mr. Musschoot on July 25, 1958, and which he accepted.

The first regular commercial order of the device was shipped March 31, 1959, under the trademark "Amplitrol." It met with prompt commercial success.

While commercial success and the filling of a long felt want do not determine patentability, they do serve to guard against what the United States Supreme Court has called the "temptation to read into the prior art the teachings of the invention in issue." Graham v. John Deere, 1966, 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545. We be-

lieve that the defendants in this case have yielded to that temptation.

On June 29, 1959, Mr. Musschoot signed and swore to the application for the patent in suit which he now attacks as invalid.

The following illustrations are taken from the patent in suit:

May 16, 1961      **A. MUSSCHOOT**      2,984,339

### TUNABLE VIBRATORY APPARATUS

Filed July 6, 1959      5 Sheets—Sheet 3

Fig VI

Fig VII

INVENTOR.
ALBERT MUSSCHOOT
BY
Marshall, Marshall & Yeasting
ATTORNEYS

_Fig. XIII_

_Fig. XIV_

_Fig. XV_

INVENTOR.
ALBERT MUSCHOOT
by
Marshall, Marshall & Yeating
ATTORNEYS

In figures VI and VII we see a vibratory feeder having a trough or work member 50 which includes a downwardly extending outrigger portion 60. The work member is supported from the foundation 56 by air springs 54 and 55 which serve as isolation or cushioning means to prevent the undesirable transmission of vibrations from the work member to the foundation. An exciter member or mass 65 is resiliently supported and guided from the work member by air bags 68 and 69. Eccentric weights 67 are attached to the shaft of a constant-speed motor 66 whereby rotation of the motor creates a centrifugal force to cause vibration of the apparatus and relative motion of the work member and exciter member along a particular path. The air bags act in opposition to each other in forcing the exciter member to a central position within the outrigger portion 60, and in aid of each other in opposing relative motion from such central position. The air bags are connected by piping 70, 71 through which air may be supplied or extracted to change the average pressure in the air bags.

The patent specification states that:

According to the invention, a vibratory work performing system, in which vibrations are produced by eccentric weights rotated at a constant speed, is equipped with a plurality of readily adjustable resilient elements in the form of air bags or air springs the internal pressure of which is regulated to adjust the condition of resonance or tuning of the vibratory system including such air bags.

The District Court found:

Insofar as the issues of this lawsuit are concerned, the patent more specifically teaches and covers two concepts. First, it teaches the use of an air bag and a connected air supply of adjustable pressure to transmit vibratory forces to a so-called work member from a vibrating mass, commonly called an exciter member, without causing undesirable vibration of the supporting structure.

The defendants contend that this is erroneous, that the air bags which prevent undesirable vibration are the isolation springs and that these do not transmit force to a work member. We agree with the plaintiff that the District Court was referring to the coupling air bags (68 and 69, Figure VI) as transmitting vibratory forces and not the isolation springs (54 and 55, Figure VII).

The District Court also found:

Adjustment of the air pressure applied to the air bag effects changes in the amplitude of vibration of the work member without interrupting operation of the apparatus. Secondly, the patent teaches the use of an air bag with an adjustable air supply in combination with a solid spring whereby adjustment of the air pressure applied to the air bag produces a change in the spring coupling between the work member and the exciter member. The coupling provided by the solid spring alone is thus modified, so that the composite spring rate of the system is changed and the feed rate made correspondingly adjustable.

16. The first concept is incorporated in the embodiment of the invention shown in Figs. VI and VII of the patent drawings and also in the embodiment shown in Fig. XV. Fig. XV further incorporates the second concept.

17. Figs VI and VII disclose a vibratory feeder having a trough or work member which includes a downwardly extending outrigger portion. The work member is supported from a foundation by isolation or cushioning means to prevent undesirable transmission of vibrations from the work member to the foundation. An exciter member is resiliently supported and guided from the work member by a plurality of air bags. Eccentric weights are attached to the shaft of a constant-speed motor whereby rotation of the motor creates a centrifugal force to cause vibration of the apparatus and relative motion of the work

member and exciter member along a particular path. The air bags act in opposition to each other in forcing the exciter member to a central position within the outrigger portion of the work member and in aid of each other in opposing relative motion from such central position. The air bags are connected by piping through which air may be supplied or extracted to change the average pressure in the air bags. While not shown in Figs. VI and VII, the specification points out that it may be desirable to include guide links between the exciter member and the outrigger portion of the work member in order to guide the exciter member along its path of movement and prevent it from sagging downwardly out of place in the event air pressure is lost from the air bags.

18. The patent in suit also teaches that it may not be necessary that the air pressure be varied in more than one of the air bags, and that if a particular air bag is to be maintained at a constant air pressure it may be replaced with a spring of solid resilient material, such as a steel spring, a rubber spring or any other non-adjustable type of spring. Such a system, which is illustrated in Fig. XV of the patent, embodies the second concept of the invention in which an air bag with an adjustable air supply is used in combination with a solid spring to form a composite spring coupling between the work member and the exciter member.

19. Fig. XV is a schematic diagram disclosing a work member suspended by resilient cables. Vibratory force is applied to the work member by means of an exciter member that is carried in a frame or outrigger forming part of the work member. The exciter member is resiliently supported and guided from the work member by means of a solid (e. g., rubber) coupling spring and an air bag. The air bag is adjustable to vary the tuning of the system. As in the case of the embodiment disclosed in Figs. VI and VII, a vibratory force is generated in the exciter member by means of a constant-speed motor carrying an eccentric weight.

20. In the operation of the embodiments of Figs. VI, VII and XV, the air bags are tuned by inflating them to a pressure that provides a spring rate such that the vibrating system comprising the resiliently supported work member, the exciter member and the coupling springs, has a resonance frequency approximately but preferably not exactly equal to the operating speed of the motor. The amplitude of vibration increases materially as the resonant system is tuned toward the operating frequency, and consequently any desired amplitude may be attained by merely selecting and supplying the proper air pressure to the air bag. This method of controlling the amplitude is graphically illustrated in Fig. XIII of the patent in suit and described in the portion of the specification relating thereto. This figure illustrates the relationship between the operating speed and the resonant frequency of the vibratory system as the pressure in the air bags is varied to change the resonant frequency. With a constant-speed motor the operating frequency remains fixed, whereas the resonant frequency of the vibratory system varies with changes in tuning of the system. When operating below resonance the maximum working amplitude of vibration is obtained with the minimum allowable air pressure in the air bags. As the air pressure is increased to a maximum, the amplitude of vibration is reduced until it is insufficient to provide a conveying action. The proximity of the operating speed to the resonant speed determines the amount of available regulability. In short, the patent in suit teaches a facile and effective method of adjusting the amplitude of vibration, and hence the feed rate, of a vibratory feeder driven by a constant-speed motor, by varying the resonant frequency

of the apparatus through a range close to but not including the operating speed of the motor.

The accused device, the Para-Mount Vibratory Feeder is illustrated in a bulletin issued by the defendants in 1961 and in the Musschoot patent No. 3,089,582, issued December 19, 1960, as both Mr. Musschoot and the defendants' expert witness, Professor Church agree. The following drawings are taken from that patent:

The patent itself states:

As shown in the drawings, the vibratory particulate material moving device of the present invention is illustrated as embodied in a feeder which includes a first member which is vibrated and as disclosed is in the form of a trough indicated generally at 10

having side walls 11 and 12 and an interconnecting bottom panel 13. The trough 10 is mounted resiliently on a fixed support 15 by means of springs located one at each corner of the trough and with springs 16 and 17 being shown at one side of the trough and a corresponding set of springs being positioned at the other side of the trough. With the resilient mounting, the trough 10 may have a vibratory movement along a generally straight-line path as indicated by the arrow A. With the movement of the trough 10 along the vibratory path A, material is advanced at a controlled rate corresponding to the rate of vibration and the device may be used for moving an infinite variety of solid materials with widely varying characteristics from hoppers, bins, silos, storage piles and process machines to conveyors, screens, containers, or other processing steps.

The means for vibrating the trough 10 along the path A comprises a resonant spring-weight system in which one mass is that of the trough 10 and the side members attached thereto and a second mass comprises a motor 20 with a pair of rotating eccentric weights 21 and 22 together with its mounting tube by which it is supported from the trough by a pair of rubber shear springs 23 and 24 to transmit force to the trough 10 generally along the line A through the springs 23 and 24 by means of shear.

Professor Church indicated that the device employs a work member, isolation springs, an exciter member, eccentric weights, and a spring system including shear or torsion springs and air bags; that the resonance system consists of the exciter, the springs, and the trough or work member; that the air bags act to help the torsion spring or act in parallel with it, to increase the overall stiffness of the connection between the exciter and the work member and raise the natural frequency of the system with the motor continuing to operate at the same speed.

Professor Church explained that connecting springs in parallel between the same bodies aided each other in establishing the total spring rate of the system—the combined spring scale is the sum of the individual spring scale.

Marvin G. Thomson, vice-president of General Kinematics Corporation, to which the Musschoot patent No. 3,089,-582 has been assigned, testified that the accused feeders can be tuned while they are operating by changing air pressure in the air bags.

The District Court found infringement of all of the claims in issue as follows:

23. At least one adjustable rate feeder, as described in defendants' bulletin No. 611, was manufactured and sold by defendants in the Northern District of Illinois between May 16, 1961, when the patent in suit issued, and the filing of the present suit on November 13, 1962.

\* \* \*

28. The accused adjustable rate feeders of defendants are further illustrated and described in a subsequent Musschoot et al. patent No. 3,089,582 (Plaintiff's Exhibit 23) taken out by defendants. Mr. Musschoot confirmed the applicability of this patent to the accused device, with no difference in principle or mode of operation.

29. Defendants' accused device, as illustrated in their patent No. 3,089,-582 is a vibratory feeder having a trough or work member to be vibrated, isolation springs which serve as cushioning means for the work member, and an excite[r] member or second mass including a motor, and rotating eccentric weights mounted on the motor shaft. The exciter member is resiliently connected to and supported and guided from the work member by a pair of air bags and solid resilient means comprising a pair of rubber shear springs. The device is given an adjustable spring rate by the addition of the air bags to add to the spring rate of the rubber shear springs. Ro-

tation of the eccentric weights "at the correct resonant frequency" of the spring-weight system results in an amplification of forces to produce a powerful conveying vibration of the trough along a particular path which is a straight line as indicated by the arrow "A" in patent No. 3,089,582. The motion of the exciter member at the point of its connection to the work member is essentially a straight-line motion in the direction of arrow "A". Air under pressure is supplied to the air bags from a suitable source, and as the pressure in the air bags is changed, the spring rate of the system is changed. The air bags in the accused device have flexible side walls and an effective area normal to the path of vibration that varies with relative displacement of the members along the path.

30. In the accused device the rotating eccentric weights provide a vibratory force of generally constant magnitude. The accused device is a resonant spring-weight system which operates at a speed generally or approximately equal to the natural or resonant frequency of the system. The motor operates at a speed of 860–890 r. p. m., and the device, as exemplified by one embodiment, is designed to have a natural frequency of 960–970 cycles per minute, from which it follows that the operating speed is within the range of 90.5% to 92.5% of the resonant frequency. Changing the air pressure in the air bags is a means of tuning the feeders by varying the natural frequency in order to bring the natural and impressed (motor speed) frequencies closer together or farther apart. Data compiled during a test on one of the accused feeders, when plotted on a graph having a frequency scale extending from zero to 1200 r. p. m. illustrate that the accused feeder is adjustable and operates in the manner taught by the patent in suit, particularly Fig. XIII thereof.

31. Claims 1, 2, 9, 11, 12, 13 and 14 of Musschoot patent No. 2,984,339

in suit read literally and directly upon the defendants' adjustable rate feeders, as illustrated and described in their bulletin No. 611 and their Musschoot patent No. 3,089,582. Each element called for in these claims, and their mode of operation, are found in the accused feeders.

32. Defendant General Kinematics Corporation has infringed claims 1, 2, 9, 11, 12, 13 and 14 of the patent in suit by manufacturing and selling the accused devices. Defendant Musschoot has likewise infringed in that the corporate defendant is no more than his alter ego, and has actively induced infringement by participating in the infringing activities of said corporate defendant and by personally promoting the sale of the accused devices. Both defendants' infringement has been conscious, deliberate and willful.

Typical of the defendants' objections to certain of the findings is their attack on those findings which refer to an exciter member resiliently connected to, supported and guided from the work member by a pair of air bags and rubber shear springs [finding 29]; which describe the accused device as a resonant spring weight system which operates at a speed generally or approximately equal to the natural or resonant frequency of the system [finding 30]; and which state that changing air pressure in the bags is a means of tuning by varying the natural frequency to bring the natural and impressed motor speed frequencies closer together or farther apart [finding 30].

Professor Church did agree that a centrifugal force produced by the rotating weights is transmitted to the work member through the spring system which causes the work member to vibrate in the direction of the arrow "A" on figure 1, supra. He stated that that would be the direction in which the force was transmitted and the work member would respond to that force. He also said that the centrifugal force produced by the weights created a straight-line

vibration giving a straight-line motion to the work member in the direction of the arrow "A" and that the motion of the exciter member where it is connected to the work member is essentially a straight-line motion in that direction. He also said on direct examination that the motion of the exciter was "constrained" and later on cross examination said that there was nothing in the patent in suit to show that "guide means" signified anything different from "constraining means." As the only connection between the exciter member and the work member in the accused device is the spring system (including the air bags and the rubber shear springs) these must support and guide the exciter member for vibration or relative motion along the path of "A". Plaintiff's expert, Professor Den Hartog, thought no other conclusion possible.

■ The defendants assert that the accused feeders do not operate at a speed generally or approximately equal to resonant or natural frequency. We find this somewhat inconsistent with statements in defendants' patent, with the testimony of Marvin G. Thomson, vice-president of defendant, General Kinematics Corporation, and with the explanations of the expert witnesses on both sides. However, imperfect practice of the teachings of a patent does not avoid infringement. Ekco Products Co. v. Chicago Metallic Mfg. Co., 7 Cir., 1963, 321 F.2d 550, 555, cert. den. 375 U.S. 970, 84 S.Ct. 490, 11 L.Ed.2d 418.

■ Similarly we note that the defendants' expert, Professor Church, testified that the accused feeders can be tuned by changing the pressure in the air bags. Just prior to that, Professor Church had explained that "tuning" means varying the natural frequency to bring the natural and impressed (motor speed) frequencies closer together or farther apart. We find no substance to the defendants' objections to the findings respecting validity or infringement.

The defendants also argue that prior art Morris Patent 3,112,653 provides for adjustment of the air pressure applied to air springs to effect changes in the amplitude of vibration without interrupting the operation of the apparatus. They assert that a coil spring (16b) in Figure 3 of that patent, infra, is just as surely a solid spring as the coil spring (154) in figure 15 of the patent in suit, and they contend that it is used in combination with an air spring with pressure applied to the air spring to modify the composite spring rate and change the feed rate, as in the patent in suit. We note, however, that in the description of Figure 3 in patent 3,112,653, 16b is called a "coupling spring."

Fig. 3

Air bags are not disclosed in that patent. Defendants' expert Professor Austin H. Church agreed that the "air springs" there were "dash pots." Later he explained that dash pots are used to absorb energy and to accomplish damping, which is foreign to the subject matter of the patent in suit and the accused devices.

The plaintiff takes great exception to the defendants' characterization of the Morris patent 3,112,653 as prior art. The patent application was filed November 28, 1958, and the invention of the patent in suit is conceded to be no later than July 17, 1958.

The defendants contend that Morris patent 3,112,653 is prior art nevertheless because (1) the inventor is John M. Morris, vice-president of Carrier Conveyor Corporation a predecessor of the plaintiff, and general manager of plaintiff's Carrier division which makes vibratory feeders; and (2) the application is a continuation-in-part of an earlier application filed July 22, 1957, resulting in patent 3,061,079, and that a description of figure 3 precedes as well as follows a statement that the systems described are similar to those disclosed in the earlier application.

The Morris patent 3,061,079 states that adjustment of the spring rate of the system while in operation may be secured by tightening or loosening a pair of nuts on the end of the bolt which clamps a pair of doughnut-shaped pieces of solid rubber between an exciter and a work member. However, plaintiff's expert, Professor Den Hartog, testified that such "adjustment" would be impractical. The stiffness of the rubber could not be greatly varied. The lock nut would have to be loosened and another nut turned by wrench while the machine was shaking violently. The device illustrated by the patent was never built.

Carrier patents 2,958,228 and 2,947,181 disclosed apparatus which can be tuned by changing the motor speed which

is not feasible during operation. These do not employ air bags, a basic element of the patent in suit and the accused devices.

We have studied the Firestone Industrial Products Company Bulletin on use of air bags to cushion shock and isolate vibration and find nothing to show an apparatus in which work is performed by vibration. Professor Den Hartog's explanation that the variable spring rate and constant natural frequency, to which the Bulletin refers, occur when the mass, like the load on a bus, varies and the spring rate varies to match such change in the mass; that it is not possible to tune the system effectively by increasing and decreasing the air in the bags because one would have to take a large amount of air out and push in a large amount of air so that the springs would operate at a height much removed from that recommended to attain a very small difference in tuning. The Bulletin suggests that different natural frequencies can be obtained with different proper-sized reservoirs and gives no other means for varying natural frequency. We find Professor Den Hartog's explanation more convincing than that of the defendants' expert, Professor Church. Although greatly learned in the fields of mechanical vibration and vibration isolation, Professor Church did profess a lack of familiarity with the formula for determining the spring rate of air bags, which is admittedly an essential factor in calculating the natural frequency of a vibratory system. Unlike the defendants, we see a substantial disagreement between these two experts with respect to the teachings of the Bulletin.

The Musschoot patent 2,993,585 was applied for February 9, 1959, at least six months after the invention in suit. It does not deal with tuning a vibratory system by changing the air pressure of air bags. It asserts that variations in the load handled by an air spring supported device will have a negligible ef-

fect on the natural frequency of the device. On examining this patent, Professor Den Hartog stated that the natural frequency of the system would remain constant.

The Musschoot patent No. 2,850,184, an apparatus for unloading a boxcar, does not employ air bags and cannot be tuned. We need not resolve the issue of the disputed availability of the Kar-Flo Boxcar as prior art. It was described in a bulletin published by the Link-Belt Company, a former employer of Mr. Musschoot, in April, 1959, months after the date of the invention of the patent in suit. In a deposition, taken September 28, 1964, Robert W. Olesen, District Sales Manager of Link-Belt Company, stated that the installation of the car was finished "the end of May [1958] somewhere in there." Under date of June 16, 1958, however, he wrote a letter in which he said that some weeks of work remained to complete the job. Mr. Musschoot himself, the inventor of the patent in suit, devised this apparatus to include air bags but it does not anticipate the invention in suit and it does not teach the accused device. It uses air springs to maintain a constant natural frequency in a system subject to substantial changes in the load carried on the air springs as the car is unloaded.

We need not comment specifically on the other prior art references. We conclude from our study of these references that none of the claims of the patent in suit on which the plaintiff relies read on the alleged prior art; that the combinations made were not such as to be obvious to one having ordinary skill in the art at the time they were made. The findings of the District Court to this effect are amply supported by the record.

■ As the District Court held, Mr. Musschoot as assignor, and General Kinematics Corporation, as organized, controlled by and in privity of estoppel with Mr. Musschoot, are both estopped to contest the validity of this patent. Libby Glass Mfg. Co. v. Albert Pick Co., 7 Cir., 1933, 63 F.2d 469, 470; Foltz Smokeless Furnace Co. v. Eureka Smokeless Furnace Co., 7 Cir., 1919, 256 F. 847.

The District Court deferred ruling on an objection to defendants' reliance on prior art until the end of the case. The Court then held that the defendants were estopped to contest the validity of the patent in suit, but also found that the prior art cited would afford no defense in the absence of such estoppel. We agree.

■ The defendants were not estopped to show that their devices were built wholly on the teachings of the prior art plus ordinary mechanical skill in order to negative infringement. Casco Products Corp. v. Sinko Tool & Mfg. Co., 7 Cir., 1940, 116 F.2d 119, 121. In our opinion, however, they failed to establish that defense.

The District Court found that infringement here was conscious, deliberate and willful and that the plaintiff was therefore entitled to recover treble the amount of its actual damages pursuant to 35 U.S.C. § 284 which allows the Trial Court to double or treble the damages assessed.

■ The plaintiff lays emphasis on the facts that the corporate defendant was organized within a month of Mr. Musschoot's leaving his employment; that a copy of the specification, claims and drawings of the patent in suit was sent to Mr. Musschoot before the patent in suit issued; and that shortly after the patent in suit issued, Mr. Musschoot participated in a conference with his attorney and with plaintiff's attorney at which he was made aware of the patent claims. However, the design of the accused device was completed prior to the issuance of the patent. While the claims of the patent in suit were still in process of being amended, a copy of the defendant's brochure was sent to the plaintiff.

**348**

This want of any attempt at secrecy argues no consciousness of deliberate infringement. Nor, on review of the record, does it seem to us that the defendants did, as charged, engage in protracted and vexatious litigation. Considering the complexities of this action, the trial (which consumed some 7½ days of which only 2½ were devoted to defendants' case and 1½ to the plaintiff's rebuttal thereto) does not seem unduly long to us. Although the Trial Judge did resolve some issues of credibility adversely to the defendants, he made no specific finding of bad faith. The record does not support a finding of such inequitable conduct as to justify either treble damages or an award of attorneys' fees. Wilson v. Seng Co., 7 Cir., 1952, 194 F.2d 399, 404, and cases there cited. Insofar as the decision of the District Court allowed treble damages and attorneys' fees, it is reversed.

▮ Mr. Musschoot was one of the original incorporators of the corporate defendant. He had been its president, director and majority stockholder since its inception. He personally participated in the design of the accused devices and of the sales bulletin therefor. He personally exerted efforts to promote the sale of the accused devices. There was support in the record for the District Court's finding that the corporate defendant was Mr. Musschoot's alter ego. It was proper to hold Mr. Musschoot liable with the corporate defendant for infringement of the patent in suit. General Motors Corp. v. Provus, 7 Cir., 1938, 100 F.2d 562, 564; Weller Mfg. Co. v. Wen Products Inc., 7 Cir., 1956, 231 F.2d 795, 801.

We have carefully considered all other points and authorities advanced by both parties but find them lacking in merit to alter our conclusions: the judgment of the District Court must be affirmed except insofar as it awards treble damages and attorneys' fees, and the judgment is accordingly so modified.

Affirmed in part, reversed in part.