**SADLER–CISAR, INC., et al., Plaintiffs,**

**v.**

**COMMERCIAL SALES NETWORK, INC., et al., Defendants.**

**No. 5:90CV 1582.**

United States District Court, N.D. Ohio, E.D.

July 26, 1991.

Phillip L. Kenner, Ray L. Weber, Sylia A. Petrosky, Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, Ohio, for plaintiffs.

Scott H. Ruport, Akron, Ohio, for defendants.

## ORDER

BATTISTI, District Judge.

Plaintiffs Stanley R. Sadler, Jr. ("Sadler"), James Cisar ("Cisar"), Sadler–Cisar, Inc. ("SCI") and Medi–Dot, Inc. ("MDI") have brought suit against Thomas Smith ("Smith"), Elisabeth Haley ("Haley"), and Commercial Sales Network, Inc. ("CSN") for breach of contract, breach of fiduciary duty, and conversion, as well as for infringement of the patent, copyright, trademark and trade dress of their product. Smith and Haley are officers of CSN, with Smith being the sole shareholder thereof. Plaintiffs' Complaint, filed on September 6, 1990, seeks a permanent injunction, damages, and a complete accounting of all transactions conducted by Defendants.

Trial, without a jury, commenced on May 21, 1991 and concluded on May 30, 1991.

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

In late 1986, Sadler and Cisar conceived the idea of a label which would help keep track of the number of times someone needed to take a particular medication; they baptized the event reminder device "Medi–Dot." In early 1987, Sadler and Cisar proceeded to protect their concept by applying for a patent. In addition, they contacted CSN and met with Smith and Haley who described themselves as printing brokers. CSN had been incorporated in 1983 by Thom Smith for the purpose of doing business within the printing industry. CSN located Graphic Resources, Inc. ("GRI") to produce the labels, and explained that they would be remunerated by a commission paid by the printer, not by Sadler and Cisar.

SCI was incorporated on April 2, 1987, and on June 25, 1987, filed a patent application. The patent—Patent No. 4,830,407 ("the '407 Patent")—was granted on May 16, 1989. (Exhibit 7). During 1987, SCI sent samples of the labels printed by GRI to drugstore chains and pharmaceutical companies; CSN followed up with telephone calls to those entities receiving the samples. During 1988, SCI redesigned its packaging and developed smaller labels; it heeded the advice of Pharmex (a large label distributor) that it should use manufacturers representatives to distribute Medi–Dot to the industry. In January 1989, CSN agreed to represent the Medi–Dot label through a nationwide network of representatives. The nationwide network did not come to fruition. The parties entered into a written contract on August 11, 1989. (Exhibit A). In other words, from early 1987 until August 11, 1989, no written agreement governed the relationship between SCI and CSN.

The contract executed on August 11 and entitled "Sales Representation and Production Agreement" named CSN exclusive

sales and production agent for Medi–Dot. SCI, however, reserved for itself "the option to fulfill any function internally as it may relate to Medi–Dot, if so desired." The contract provided commissions on sales but not on production, since SCN had represented that it obtained its commissions directly from the printer. The year 1989 proved largely disappointing with regards to sales. The record shows that CSN undertook only eight sales calls during that year.

In early 1990, ICI Pharmaceutical showed interest in placing a major order. This marked a turning point in the relationship between the parties, for Sadler and Cisar, suspecting that CSN had "marked up" the cost, questioned the quote CSN obtained from GRI for manufacturing the ICI labels. The evidence showed that for some time CSN had been marking up costs, contrary to the understanding the parties had that, as a broker, CSN was paid a commission by the printer (Exhibit 35, 9–26–88 letter from GRI to Haley and 9–7–88 invoice from CSN to SCI). On February 13, 1990, ICI ordered 1,000,000 labels resulting in a payment of $137,000 which was received in June 1990. CSN entered the contract in its own name and sought to preclude SCI from access to information. Moreover, regarding the contract, the check from ICI was issued to CSN, not SCI. Whereupon, Sadler and Cisar insisted upon safeguards to prevent CSN from obtaining secret profits and to make sure that SCI, as the principal, would be informed of all activities of its agent. (Exhibits 38 through 44).

For SCI to obtain any monies from the project, it was required to sign a release approving CSN's scheme for the distribution of funds.

As early as April 3, 1990, when they first contacted a patent law firm, Defendants began entertaining the idea of developing an event reminder device of their own called "AccuTRAK." Shortly thereafter, they turned the idea into a reality (Exhibits 59, 60, 62, 63, and 64) and proceeded to tap the same customers that they had called upon with regard to Medi–Dot. It did this

while bound by its agency contract with SCI.

For name recognition purposes, on May 7, 1990 Sadler and Cisar executed the Articles of Incorporation for MDI (effective May 11, 1990). Unaware that Defendants were in the process of marketing "AccuTRAK," Plaintiffs suggested that they would be willing to start over with a new contract. On June 25, 1990 SCI sent the proposed terms indicating that the new contract would be entered into between CSN and MDI. CSN replied: "We consider our existing contract to be valid and enforceable and do not desire any changes at this time. We will continue to service established markets as your exclusive sales and production agent." (Exhibit "J"). On July 5, 1990, one day before the July 6th deadline for responding to SCI's and MDI's proposal for a new contract, CSI began notifying third parties that they had dropped SCN and would be doing their own sales and marketing from then on. (Exhibit N–5). These letters were not mailed, however, until July 9, 1990, after receipt of CSN's letter rejecting the proposal. Then by letter dated July 12, 1990, from SCI's counsel, CSN, Haley and Smith were put on notice that the contract had been breached and that they were no longer authorized agents of MDI. This letter also listed damages SCI claimed for contract breach. (Exhibits 54, 55).

In order to determine whether CSN had stopped dealing with Medi–Dot, Connie Cisar (Cisar's wife) called CSN on July 31, 1990 posing as Margaret Stiles, working with a newsletter from Cuyahoga Falls Medical Center, and asked about Medi–Dot. Sounding as if Medi–Dot and AccuTRAK were both theirs, Haley answered that she was willing to send out information on Medi–Dot but that CSN now had a new "sister" product more efficient than Medi–Dot—AccuTRAK. (Exhibit 31).

In August 1990, Defendants filed a suit still pending in Summit County Common Pleas Court, against Plaintiffs seeking to enforce the August 11, 1989 contract. On September 6, 1990, Plaintiffs filed the present action and also a notice of removal

of the state court action. Thereafter, Plaintiffs attempted to consolidate the two actions. This Court remanded the state court action on January 2, 1991, 755 F.Supp. 756, due to lack of subject matter jurisdiction relating to the contract claims. On or about September 28, 1990, Smith and Haley filed a patent application for "Apparatus and Method for Promoting Pharmaceutical Compliance."

*Conclusions of Law*

Patent Infringement

The '407 patent teaches an event reminder device in the form of a label and in which rows and columns may be removed. The patent specification declares that such a removal is "facilitated by perforating, scoring, or otherwise weakening" the label, but "the scope of the invention is not limited thereto, but rather is measured by the scope of the ... claims." (Exhibit 7, column 3, line 50–54 and column 4, lines 54–57). Though the specification teaches perforations or scoring as a means to facilitate a customizing feature of the patented product, the embodiment of the invention presented in the specifications does not restrict the patent claims.

◾ The Patent Act of 1952, 35 U.S.C. § 1 et seq., which applies to all patents granted on or before January 1, 1953 is the controlling law in this case. The claims of the patent constitute the formal definition of the invention. The specification sets forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. This one embodiment of the invention does not restrict the claims. *See Autogiro Company of America v. United States*, 384 F.2d 391, 398 (Ct. of Claims 1967). In other words, the claims, not the specification, measure the invention. *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 699 (1983).

◾ Determination of patent infringement requires two steps: the meaning of the claims must be learned from a study of all relevant patent documents and the claims must be applied to the accused structures. *Caterpillar Tractor Co. v. Berco S.p.A.*, 714 F.2d 1110 (1983).

◾ The patent claims at issue only require that the sheet or label be "adapted to having at least some of said spaces optionally detached therefrom" (claim 1) or that "at least some of said recording spaces [be] optionally removable from said label." (claim 7). They do not require the presence of perforations. It is improper to resort to the patent specification in an attempt to avoid either infringement or invalidity. *Environmental Designs* at 699.

◾ The accused AccuTRAK product (Exhibit 4) does not incorporate any perforating, scoring, or otherwise weakening of the label; that is, the use of scissors or creasing is required to remove an unneeded column of dots. As previously stated, such a specification does not restrict claims 1 and 7. Furthermore, it is improper to read into independent claims 1 and 7 the limitation of "perforations" which is explicitly stated in dependent claims 4, 8, and 9. *Id.; SRI Int'l v. Matsushita Elect. Corp.*, 775 F.2d 1107 (Fed.Cir.1985). Claims 1 and 7 cannot be read to include perforations, because perforations are explicitly set forth in other claims such as claims 4, 8, and 9. *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110 (Fed.Cir.1983).

◾ Each and every element of claims 1 and 7, as well as those of claims 2, 3, 5, 6, and 10 are found in the AccuTRAK product (Exhibits 4 and 7). The printed dashed lines between the space columns coupled with the instruction on the AccuTRAK package that reads "customize Accu-TRAK–4X to 3, 2, or 1 time(s) a day by simply cutting off the extra columns" translate into AccuTRAK having recording spaces that are "optionally removable." This makes AccuTRAK readily distinguishable from the prior art Baustin label (Exhibit CCC–23) which was devoid of both printed dashed lines and cutting instructions. Evidence at trial showed that the AccuTRAK structures do the same work, in substantially the same way, and accomplish substantially the same result to constitute infringement based on the theory of equivalence. However, since the requirements or literal infringement—that the ac-

cused device embody every element of the claim—are met, there is no need to determine the equivalence of structures. This Court concludes that AccuTRAK literally infringes claims 1, 2, 3, 5, 6, 7 and 10 of Patent '407. *See Builders Concrete Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255 (Fed.Cir.1985).

## Patent Validity

■ Patent '407 enjoys a statutory presumption of validity. 35 U.S.C. § 282. Defendants carry the burden of showing by clear and convincing evidence that the patent is invalid. *Greenwood v. Hattori Seiko Co. Ltd.*, 900 F.2d 238 (Fed.Cir.1990). "A court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish the contrary. A patent being presumed valid at birth, § 282, a patentee need submit no evidence in support of a conclusion of validity...." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed.Cir.1986).

■ If, however, the patent challenger introduces evidence putting in question the patent's validity, a patentee is well-advised to introduce evidence to rebut the challenge. *Id.*

■ In the instant case, Defendants introduced prior art—namely, Patent No. 3,283,885, the Grunewald Patent (Exhibit CCC–22)—arguing that it was more pertinent than the prior art (the Baustin patent) cited by the Patent and Trademark Office at the time of Medi–Dot's patent application. As its title points out, the Grunewald patent deals with a "Package for Medicament Tablets." It is not a label conceived as an event reminder device. It specifically relates to the type of package often used for dispensing birth control pills. Furthermore, the Court does not find persuasive Defendants' equating the piercing of a foil cover in Grunewald with the "abrading" of "rub-off" material set forth in the Medi-Dot claims. At trial, Defendants' patent expert, their own attorney, Daniel J. Hudak, admitted that, like Baustin, Grunewald does not teach or suggest the optionally removable or detachable recording spaces recited in the claims of the '407 patent.

35 U.S.C. § 102 states:

A person shall be entitled to a patent unless (...)

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

Grunewald does not render Patent No. '407 invalid under 35 U.S.C. § 102 for it does not disclose each and every element of the challenged claims. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed.Cir.1986), *cert. den.*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792. Specifically, Grunewald does not teach or suggest optionally removable or detachable recording spaces.

35 U.S.C. § 103 states:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the differences between the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Defendants have failed to carry the burden of showing that Patent No. 4,830,407 would be obvious under 35 U.S.C. § 103 in view of the Grunewald patent.

■ Defendants have not (1) determined the scope and content of the prior art, (2) assessed the differences between the prior art and the claims in issue, and (3) establish the level of ordinary skill in the pertinent art at the time the invention was made. Having failed to establish that background, there can be no showing of obviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In addition, Defendants have failed to present evidence as to the level of skill element in the *Graham* obviousness analysis such as (1) the educational level of the inventors, (2) types of

problems encountered in the art, (3) prior art solutions to those problems, (4) rapidity with which innovations are made, (5) sophistication of the technology, and (6) educational level of workers active in the field. *Environmental Designs Ltd. v. Union Oil Co. of California*, 713 F.2d 693 (Fed.Cir. 1983).

Defendants have failed to carry the burden of proving that Patent No. 4,830,407—the Medi Dot patent—is invalid.

*Defendants' Fraudulent Patent Application*

As early as May 1988, Sadler had conceived of making a reminder label having only a small strip of exposed adhesive thereon for use on small medicine bottles. The remainder of the label would be a flap. (Exhibit 20). Sadler made hand samples of the flap label and sent them to Pharmex on June 1, 1988 (Exhibit 24). This concept was further discussed during June and August of that year. (Exhibit 21, 22, 23). Simultaneously, Sadler and Cisar prepared formal drawings of the flap label and gave them to Haley in order to have a dye and sample labels made by GRI. (Exhibit 16). GRI had sample test products ready soon thereafter. (Exhibits 17, 18, 19). The flap-type Medi–Dot product was offered for sale to Pharmex in August 1988. (Exhibits 21–24).

Claims 1 and 7 of Defendants' patent application Serial No. 590, 158 for "Apparatus and Method for Promoting Pharmaceutical Compliance" read directly on the flap-type Medi–Dot product (Exhibits 14, 19). Such a product was not only conceived and developed by Plaintiffs, it was offered for sale over two years prior to the filing of Defendants' patent application. (Exhibits 14, 16–24).

Similarly, in May 1988, Cisar designed a "Twice–A–Day" label and made a drawing of the same. (Exhibit 95). He gave the drawing to Haley who, on June 1, 1988, obtained a quote from Kennedy Tape and Label for its production. (Exhibit 96). Labels according to the drawing were made by Kennedy Tape and Label and sent to Ron Glassman at Pharmex on or about July 1, 1988. (Exhibits 94–97). This "Twice–A–

Day" label was made as part of Plaintiffs' concept of a series of labels, one for each of "Once–A–Day," "Twice–A–Day," "Three–Times–A–Day," and "Four–Times–A–Day." Independent claim 23 of the Smith and Haley patent application reads directly on the series of labels conceived, developed, and offered for sale by Sadler and Cisar more than two years prior to the filing of the Smith and Haley patent application. (Exhibits 14, 22, 94–97).

For the proposal to ICI Pharmaceutical in early 1990, Sadler prepared renderings of booklets for the labels, one opening vertically and the other opening horizontally, and his wife Marilyn prepared physical "mock-ups" of the booklets. The renderings and mock-ups were given to Smith and Haley for the presentation to ICI Pharmaceuticals. (Exhibit 98). Independent claim 11 of the Smith and Haley Patent application reads directly on the booklets conceived and developed by the Sadlers for the ICI Pharmaceutical proposal. (Exhibit 14).

The patent application of Smith and Haley contains five independent claims (Claims 1, 7, 11, 17 and 23). Of these, claims 1, 7, 11, and 23 are directed to products conceived and developed by Sadler and Cisar, not by Smith and Haley. Furthermore, claims 1, 7, and 23 were offered for sale more than a year prior to September 28, 1990, the filing date of the Smith and Haley patent application. Smith and Haley were aware of such offers for sale. (Exhibits 14, 16–24, 94–97).

A patent application must be filed within a year of the time that the product disclosed and claimed in the patent application is first placed on sale. 35 U.S.C. 102(b); *Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587 (Fed.Cir. 1984). A single offer for sale is sufficient to bar patentability, even where the offer is not accepted. *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1308 (Fed.Cir.1988). Defendants' patent application is invalid, for certain of the inventions disclosed and claimed therein were on sale more than a year prior to the application filing date.

Defendants executed a false oath and filed the same with their application in the Patent Office, claiming themselves to be the inventors of concepts conceived and developed by Sadler and Cisar, and having been on sale more than a year prior to the application filing date. Any patent issuing from such an application, based on a false oath, is invalid too. *Liquid Carbonic Corp. v. Goodyear Tire & Rubber Co.*, 38 F.Supp. 520 (D.C.Ohio 1941). Moreover, the inequitable conduct of Defendants in filing a fraudulent patent application renders all claims of the patent unenforceable, not just the particular claims to which the inequitable conduct is directly connected. *J.P. Stevens & Co., Inc. v. Lex Tex, Ltd.*, 747 F.2d 1553 (Fed. Cir.1984).

Accordingly, Defendants' patent application is stricken and any patent ensuing from that application is held invalid. *Aktiebolag v. Waukesha Cutting Tools, Inc.*, 640 F.Supp. 1139 (E.D.Wis.1986).

*Patent Mismarking*

The basis of patent mismarking is contained in 35 U.S.C. § 292 which states that:

> Whoever marks upon, or affixes to, or uses in advertising in connection with any article, the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public—shall be fined not more than $500 for every such offense.

Requisites for liability under § 292 include that the advertising or use of the word "patented" be made in conjunction with a device which is not patented and an intent to deceive. Proof that the article illegally marked "patented" or "patent pending" was afterwards sold, or was otherwise presented to the notice of the public, is not a necessary element.

Plaintiffs have the burden of proof of showing that Defendants acted with the specific intent to deceive the public. *Brose v. Sears Roebuck & Co.*, 455 F.2d 763, 768 (5th Cir.1972). If Defendants then come forward with evidence of good faith, this may rebut a showing of actual intent to deceive the public.

The record shows that Plaintiffs have carried their burden of proof. Defendants marked the AccuTRAK product with the designation "patent pending" and offered it for sale when no patent application was in fact pending. This mismarking could not have been solely the result of inadvertence. Evidence at trial indicated that Defendants had indeed the specific intent to deceive, and the mere fact that they had consulted a patent attorney does not exonerate them. As Judge Brown said in *Brose v. Sears, Roebuck & Co.*, "For here not only are objective physical facts involved. Here are questions of motive, purpose and attitudes." *Id.* at 768. As in other areas of the law, reasonable inferences may properly be drawn from established facts in order to prove intent to deceive. Such an inference is, of course, not beyond refutation, but Defendants, in the instant case, have failed in their efforts to refute it. *See* 8 Deller's Walker on Patents § 596 (1973).

Accordingly, Defendants are liable for false marking under 35 U.S.C. § 292. However, continuous markings over a given time constitute a single offense. *Hoyt v. Computing Scale Co.*, 96 F. 250 (S.D.Ohio 1899); *London v. Everett H. Dunbar Corp.*, 179 F. 506 (1st Cir.1910). Defendants are therefore liable for only one "offense" under the statute and are hereby fined $500.00.

*Copyright Infringement*

Under 17 U.S.C. § 411(a), a plaintiff can file a suit for copyright infringement before he has obtained his copyright registration from the copyright office. However, the plaintiff must at least have filed an application for registration before the suit is filed. If the registration issues from the application, then the effective date of the registration is the date of the application, the registration predates the filing of the suit, and section 411(a) is satisfied.

If the Copyright Office refuses registration, the Plaintiff must send a notice of the infringement suit with a copy of the Complaint to the Copyright Office. The Copyright Office would then have the right to intervene and become a party to the infringement suit if it wishes.

In September 1990, SCI filed two copyright applications directed towards "event reminder device and packaging associated therein." The Copyright Office rejected the applications, recommending the filing of a new application describing the nature of authorship as "text on envelope" instead of "event reminder device and packaging associated therewith." (Exhibit 34). SCI filed the new copyright application on March 20, 1991. That copyright application has been assigned to MDI (Exhibit 34).

This Court need not address the merits of Plaintiffs' contention that the AccuT-RAK envelope (Exhibit 3) and the AccuT-RAK flier (exhibit 5) substantially copy the text of the Medi–Dot envelope protected by copyright under the pending substitute application. (Exhibit 91). This is so because Plaintiffs have failed to comply with the requirement set forth in § 411(a) that the Copyright Office be notified of the instant infringement suit and receive a copy of the complaint. Accordingly, Plaintiffs' count for copyright infringement is not properly before this Court and is hereby dismissed.

*Trade Dress Infringement*

Each of the Medi–Dot labels consists of an array of blue dots, horizontally interconnected with a solid line. In the "over the counter" ("OTC") version of the product, they are sold in packages of twelve. Each label has the days of the week listed vertically, and spaces for hours of the day are provided horizontally. They are sold in an envelope with instructions for use. (Exhibits 1, 2).

During the three years preceding the filing of this case, Medi–Dot labels having the trade dress identified above were promoted and distributed extensively to the pharmaceutical trade, including drug chains, pharmaceutical companies, and OTC buyers. Press releases, promotional kits, and customized and personalized packages were, on numerous occasions, distributed into the trade with such mailings being followed up with personal solicitations. (Exhibits 26, 27, 28, 30, 101).

The AccuTRAK product, through its physical structure, packaging, and promotional materials, has adopted substantially the same trade dress as that developed and promoted for Medi–Dot. (Exhibits 1–5). Not only do Medi–Dot and AccuT-RAK bear a striking similarity in appearance to each other (Exhibits 2, 4), but the packaging and promotional fliers of AccuT-RAK (Exhibits 3, 5) bear a striking similarity to the packaging for Medi–Dot. (Exhibit 1). For example:

1. "Be certain with AccuTRAK" (Exhibit 5) with "Be certain with Medi–Dot" (Exhibit 1).
2. "One dot equals one dose" (Exhibits 3 and 5) with "One Dot equals one dose" (Exhibit 1).
3. "Yellow dot-dosage has been taken" (Exhibit 3) with "White dots indicate medication was taken" (Exhibit 1).
4. "Place on unused side of prescription bottle" (Exhibits 3, 5) with "Place Medi–Dot on unused area of medicine bottle" (Exhibit 1).
5. "Write medication hour in provided boxes" (Exhibit 3) with "Medication times can be written here" (Exhibit 1).
6. "Customize AccuTRAK to 3, 2, or 1 time(s) a day by simply cutting off the extra columns" (Exhibits 3, 5) with "Medi–Dot can be customized to track 1, 2, 3, or 4 doses per day, by removing the excess columns at perforations" (Exhibit 1).
7. "Scratch off with coin or fingernail" (Exhibit 3) with "Rub off dot with coin or fingernail" (Exhibit 1).
8. "Did I take my medication?" (Exhibit 5) with "Did you take your medicine?" (Exhibit 1).
9. "Take medication as prescribed" (Exhibits 3, 5) with "Take medication as prescribed" (Exhibit 1).
10. "Scratch off reminder labels" (Exhibit 5) with "Rub-off reminder labels" (Exhibit 1).

11. "12 weeks supply" (Exhibit 3), with "12–weeks supply" (Exhibit 1).

■ Trade dress is not protectible unless it has been found to have a secondary meaning. *Astatic Corp. v. American Electronics, Inc.,* 201 U.S.P.Q. 411, 419 (N.D.Ohio 1979). Secondary meaning has been defined as follows:

> The crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of the goods. To establish secondary meaning, it must be shown that the primary significance of the term in the minds of the consuming public is not the product but the producer.

*Mr. Gasket Co. v. Travis,* 35 Ohio App.2d 65, 299 N.E.2d 906, 179 U.S.P.Q. 811, 814 (1973).

■ The AccuTRAK product was printed by the same printer and designed by the same graphic designer (GRI) that had launched the Medi–Dot product. It was made using the same ink employed in producing Medi–Dot. Testimony at trial indicated that numerous people, including one of CSN's representatives, were confused between the AccuTRAK and Medi–Dot products, believing that they were one and the same, coming from the same source. (Exhibit 31). Testimony also indicated that the confusion between Medi–Dot and AccuTRAK was intentionally generated, not only by the adoption of the same trade dress for AccuTRAK but also by referring to AccuTRAK as a "sister" product or "parallel" product, and by using the same sales people for both, calling upon the same customers for both products, and disclosing and discussing both products in the same sales calls. (Exhibits 31, 56). The confusion shows that the trade dress of the Medi–Dot product had acquired secondary meaning. *American Scientific Chemical, Inc. v. American Hospital Supply Corp.,* 690 F.2d 791 (9th Cir.1982).

In assessing the trade dress infringement issue, it is clear that (1) the trade dresses of Medi–Dot and AccuTRAK are highly similar; (2) the trade dress of the Medi–Dot product had become well-known to pharmaceutical companies and drug chains; (3) AccuTRAK and Medi–Dot are not only related, but are substantially related as to purpose, function, and use; (4) actual confusion has been encountered in the market as to AccuTRAK and Medi–Dot; (5) the marketing channels for the two products are the same; (6) the degree of purchaser care is minimal in that the products are inexpensive and disposable; and (7) Defendant's intent in adopting the trade dress was to encourage others to believe that the two products were "sister" or "parallel" products. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642 (6th Cir.1982), *cert. den.,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182. Based upon these *Frisch* factors, there is indeed likelihood of confusion.

*Trademark Infringement and False Designation of Origin*

While the exclusive sales agent for SCI on the Medi–Dot product, CSN, Smith and Haley disclosed and offered the AccuTRAK product to customers during sales calls initiated for Medi–Dot. Haley and Smith offered AccuTRAK to the same customers that they had called on for Medi–Dot. There was testimony to the effect that Smith led others to believe that he was president of SCI and owned Medi–Dot. (See also Exhibit 31). Smith and Haley told customers that AccuTRAK was a "sister" product of Medi–Dot and that it was a "parallel" system. Shortly after SCI terminated CSN, SCI sensed extreme confusion in the marketplace by customers who referred to Smith as being the president and owner of Medi–Dot; believed that the Medi–Dot patent was about to expire, that tests undertaken at Temple University on behalf of Medi–Dot were done on behalf of AccuTRAK, that the Medi–Dot and AccuTRAK labels were one and the same, and that orders placed by Rite–Aid for Medi–Dot were intended to be placed for AccuTRAK (Exhibits 31–33). At trial, Smith admitted that his business card could lead people to believe that he was "president of Medi–Dot," while Haley admitted that she and Smith were always concerned that they were selling AccuTRAK to the same cus-

tomers that they had dealt with as the exclusive representative of Medi–Dot. Over the course of three years, nearly all of the advertising and promotional literature, as well as the product sent to pharmaceutical and drug chains identified CSN, Smith and Haley as being directly associated with Medi–Dot. (Exhibits 26, 27, 18, 30, 101).

■■■■■ Plaintiffs' trademark "Medi–Dot" is not a registered trademark. Therefore, Plaintiffs bear the burden of providing that their trademark is valid and enforceable. *Reese Publishing Co. v. Hampton International Communications, Inc.*, 620 F.2d 7, 11 (2d Cir.1980). Thereafter, they must show that Defendants have improperly used the Medi–Dot trademark so as to create a likelihood of confusion and infringe plaintiffs' trademark. The same analysis used in trade dress infringement applies here to determine whether there is a likelihood of confusion. Again, the application of the Frisch factors (strength of plaintiff's mark, relatedness of the goods, and similarity of the marks, evidence of actual confusion, marketing channels used, likely degree of purchaser care, defendant's intent in selecting its mark, and likelihood of expansion of the product lines) are relevant.

■■■ The claim of false designation of origin is based upon section 43(a) of the Trademark Law, 15 U.S.C. § 1125(a), which states:

(a) Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the application, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, charac-

teristics, questions, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

The standard proof to prevail in an action under section 43(a) is a showing of "likelihood of confusion." *Frisch's* at 650. Therefore, the proof and legal requirements of false designation of origin are essentially identical to those of trade dress and trademark infringement, and the eight *Frisch's* factors apply to false designation as well.

In applying the first *Frisch's* factor, there is ample evidence that Plaintiffs have a strong mark. In examining the second and fifth factors, it is evident that the goods are related and that the same marketing channels were used. The actual confusion—the fourth factor—generated by AccuTRAK resulted not from the change of relationship brought about by Plaintiffs' rescission letter of July 12, 1990 but rather from the deliberate acts of Defendants.

Defendants have infringed Plaintiffs' trademark Medi–Dot, and used a false designation of origin in association with their products in violation of section 43(a) of the Trademark Law, 15 U.S.C. § 1125(a).

*Breach of Contract and Breach of Fiduciary Duty*

■■■ The principal and agent relationship between SCI and CSN is contractual and is defined by the terms of the August 11, 1989 contract. Before that date, an oral contract was in effect between the parties. As an agent, CSN was required to use its best efforts in its representation of its principal, SCI. *Cristallina, S.A. v. Christie, Manson & Woods, Int'l, Inc.*, 117 A.D.2d 284, 502 N.Y.S.2d 165 (1986). Defendants owed a fiduciary duty to Plaintiffs. *Hobson v. Eaton*, 399 F.2d 781 (6th Cir.1968), *cert. den.* 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459.

The contract (Exhibit 36) establishes that "SCI should notify CSN in writing and clearly state all problems." Thereafter, "SCI has the *option* of initiating a probationary period." (emphasis added). Then, if

CSN failed "to comply with these requests or changes, [the] contract will be considered null and void."

SCI placed CSN on written notice of the problems it had identified on two different occasions. At those times, SCI was unaware of much of Defendants' activity, and was certainly not aware of AccuTRAK. Even if SCI had not clearly notified CSN of all problems in writing, it would be inequitable to hold that SCI's termination of the contract was wrongful, since such a notice would have been futile in view of Defendants' prior abandonment of the contract.

■ When a right to terminate is contracted for by the parties, it is uniformly enforced by the courts *unless* circumstances have arisen before notice is given which should, in equity, prevent the assertion of the right. The courts enforce such a clause upon fair and equitable terms. *Blount v. Smith,* 12 Ohio St.2d 41, 231 N.E.2d 301 (1967). *Central Ohio Co-operative Milk Producers, Inc. v. Rowland,* 29 Ohio App.2d 236, 281 N.E.2d 42 (1972).

■ Defendants maintain that, regardless of any wrongs committed by them, the use of the word "rescinded" results in an election of remedies which now precludes Plaintiffs from suing for their damages under the contract. The record establishes that Defendants, in producing and marketing AccuTRAK, committed an antecedent breach. Plaintiffs are entitled to sue for this breach and request the relief necessary to place them in the status quo ante. *Stires v. Park Bar Restaurant, Inc.,* 71 Ohio Law Abs. 242, 130 N.E.2d 369 (1954).

■ Defendants have raised the issue of being placed in the status quo by Plaintiffs as the parties seeking to have the contract rescinded. The evidence shows, however, that what the Plaintiffs may have received under the contract was a result of their own efforts and not those of Defendants. *Springfield Fire & Marine Ins. Co. v. Hull,* 51 Ohio St. 270, 37 N.E. 1116 (1894). Even if Plaintiffs had received something of value under the contract, Plaintiffs are not required to restore that

value to Defendants because Defendants' actions are the cause of Plaintiffs' inability to make such a restoration. *Reed v. McGrew,* 5 Ohio 376 (1832).

By their various acts of (1) competing with their principal, (2) making secret profits, (3) improperly benefiting from product research and development, (4) using their principal's customer lists, (5) attempting to preclude their principal from the market by excluding it from the graphic designer (Advertising Graphics) and printer (GRI), (6) having its principal's check on the ICI order made out to them and refusing to pay the check over to SCI, (7) not following their principal's directions, (8) creating a fraudulent document regarding printing costs, (9) filing a fraudulent patent application on concepts developed by their principal, (10) withholding vital operating information from their principal, (11) entering into a secrecy agreement without authority to do so, and (12) not acting in their principal's best interest, Defendants breached their duty of good faith and fair dealing. As such, the agency relationship was properly terminated by Plaintiffs. *Miller Agency Co. v. Greene,* 39 Ohio App. 503, 177 N.E. 534 (1931).

■ Defendants gained personal profits as a result of concealment of the actual costs for printing the Medi–Dot product and use of its principal's customer lists and established accounts, as well as benefiting from the research and development paid for by its principal. As Plaintiff's agent, such personal profits are not allowable absent a full and fair disclosure to the principal. Defendants are hereby required to account for and surrender any such profits to their principal and are denied the right to any compensation to which they may otherwise be entitled as a penalty for bad faith performance. *Hey v. Cummer,* 89 Ohio App. 104, 97 N.E.2d 702 (1950). This applies to tangible and intangible property. *Patterson v. Pollock,* 84 Ohio App. 489, 84 N.E.2d 606 (1948).

*Damages*

■ It is well settled that corporate officers who actively aid and abet their

corporation's infringement may be personally liable for inducing infringement under § 271(b) regardless of whether the corporation is the alter ego of the corporate officer. *Power Lift, Inc. v. Lang Tools, Inc.,* 774 F.2d 478, 481 (Fed.Cir.1985).

Infringement is a tort, *Carbice Corp. v. American Patents Development Corp.,* 283 U.S. 27, 33, 51 S.Ct. 334, 336, 75 L.Ed. 819 (1931), and officers of a corporation are personally liable for tortious conduct of the corporation when they personally take part in the commission of the tort as they did in the instant case. *See* generally 3A W. Fletcher, Cyclopedia of the Law of Private Corporations § 1135 (rev. perm. ed. 1975). Courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement. See, e.g., *White v. Mar–Bel, Inc.,* 509 F.2d 287, 185 (5th Cir.1975); *Rex Chainbelt, Inc. v. General Kinematics Corp.,* 363 F.2d 336 (7th Cir.1966); *see generally* D. Chisum, Patents, § 16.06, at 16–76 to 16–85 (1986).

The evidence established the make-up and control of CSN. Smith testified that he was at all material times the President and sole stockholder of CSN. Moreover, the evidence firmly established that Smith and Haley were directly responsible for the design and production of the infringing AccuTRAK and that they were the only ones who stood to benefit from sales of the product. The evidence is therefore fully sufficient to support imposition of personal liability on Smith and Haley.

Defendants, their agents, servants and employees, and those acting in active concert or participation with them, are permanently enjoined from using the mark Medi–Dot, the trade dress of the Medi–Dot product, or any other mark or trade dress which is likely to cause confusion, mistake, or to deceive. 15 U.S.C. § 1116.

In addition, Defendants, their agents, servants and employees, and those acting in concert or participation with them, are enjoined for a period of time equalling the length of the relationship between the parties (three years) from all activity respecting any compliance type reminder device in order to allow Plaintiffs the opportunity to gain the market position they would have enjoyed, but for Defendants' wrongful acts. *Springs Mills v. Ultracashmere House Ltd.,* 724 F.2d 352 (2d Cir.1983); *Elizabeth Taylor Cosmetics Co. v. Annick Goutal S.A.R.I.,* 677 F.Supp. 144, 6 U.S.P.Q.2d 1571 (S.D.N.Y.1987).

The Defendants and all those in concert with them are permanently enjoined from future infringement of the '407 patent. 35 U.S.C. § 283; *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552 (Fed.Cir.1984).

Plaintiffs are entitled to damages for corrective advertising (*Kentucky Fried Chicken Corp. v. Famous Recipe Fried Chicken, Inc.,* 157 U.S.P.Q. 697 (N.D.Ohio 1968)), the intentional copying of Plaintiffs' trade dress and palming off of its AccuTRAK product (*Shen Mfg. Co. v. Suncrest Mills, Inc.,* 673 F.Supp. 1199 (S.D.N.Y. 1987)), harm to business reputation (*Obear–Nester Glass Co. v. United Drug Co.,* 149 F.2d 671 (8th Cir.1945)), attorney fees (15 U.S.C. § 1117; *WSM, Inc. v. Wheeler Media Services, Inc.,* 810 F.2d 113 (6th Cir.1987)), actual and exemplary damages together with costs associated with this action (*Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964)).

The matter of damages is referred to Magistrate Jack Streepy for a report and recommendation to this Court following a hearing in which an accounting shall be conducted. The Magistrate shall initiate this proceeding within sixty (60) days of the entry of this Order.

IT IS SO ORDERED.